John DOE, Richard Roe and Samuel Poe, individually and on behalf of all other persons similarly situated, Plaintiffs,

v.

Hon. George E. PATAKI, in his official capacity as Governor of the State of New York, et al., Defendants.

No. 96 Civ. 1657 (DC).

United States District Court, S.D. New York.

Sept. 24, 1996.

See also, 919 F.Supp. 691.

Robert M. Baum, Attorney-in-Charge, The Legal Aid Society, Criminal Defense Division by Thomas M. O'Brien, Susan L. Hendricks, Laura R. Johnson, New York City, Norman Siegel, Christopher Dunn, New York Civil Liberties Union Foundation, New York City, for Plaintiffs.

Dennis C. Vacco, Attorney General of the State of New York by Christine E. Morrison, Assistant Attorney General, New York City, for Defendants.

Mary Jo White, United States Attorney for the Southern District of New York by Daniel S. Alter, Assistant United States Attorney, New York City, for Amicus Curiae, United States of America.

Constantine & Partners by Eliot Spitzer, New York City, Dennis Saffran, American Alliance for Rights and Responsibilities, New York City, for Amici Curiae American Alliance for Rights & Responsibilities, Protecting Our Children, Justice for All, Parents of Murdered Children of New York State, and Take Back New York.

## *OPINION*

CHIN, District Judge.

In this case, plaintiffs challenge the constitutionality of the New York State Sex Offender Registration Act, N.Y.Correction Law §§ 168 to 168–v (McKinney Supp.1996) (the "Act"), as applied to individuals who committed their crimes before the Act took effect. I issued a preliminary injunction on March 21, 1996 enjoining retroactive application of the "public notification" provisions of the Act. *Doe v. Pataki*, 919 F.Supp. 691 (S.D.N.Y. 1996). The parties have now filed cross-motions for summary judgment.

The principal issue presented is whether the Act increases the punishment for sex offenses after the fact. If so, the Act would violate the Ex Post Facto Clause of the United States Constitution if it were to be applied to individuals who committed their crimes before the Act took effect on January 21, 1996. If not, the Act could be applied retroactively without violating the Ex Post Facto Clause.

The provisions of the Act, commonly referred to as New York's "Megan's Law," are now well-known. The "registration" provisions require convicted sex offenders to register with law enforcement authorities after parole or release. The "public notification" provisions permit law enforcement authorities, in certain circumstances, to notify the public of the identity and whereabouts of registrants.

I hold that the public notification provisions of the Act constitute punishment and that they increase punishment after the fact. Hence, their retroactive application would violate the Ex Post Facto Clause.

The public notification provisions are quintessentially punitive in nature, for several reasons. First, although the legislature's stated intent in passing the Act was to protect, it is clear that the legislature also intended to punish sex offenders. In approv-

ing the Act, members of the New York State legislature referred to sex offenders as "depraved," "the lowest of the low," "animals," and "the human equivalent of toxic waste." (New York State Assembly Debate Minutes, June 28, 1995, at 360–61, 393, 417) ("Assembly Minutes"). One member flatly stated: "We are coming out to get them." (*Id.* at 360).

Second, the design of the Act suggests that the public notification provisions are punitive in nature. The Act contains classic indicia of a punitive scheme: it is triggered by the commission of a crime; it provides for the sentencing judge to determine the level of notification; and it provides for the submission of victim impact statements. Moreover, the Act is excessive in its sweep, covering an overly broad group of offenses and individuals and permitting broad and virtually uncontrolled disclosure.

Third, history suggests that public notification is punitive in nature. Historically, branding and other public forms of shaming were used to punish wrongdoers and in egregious situations banishment was imposed. Public notification is the modern-day equivalent of branding and banishment. Moreover, banishment is precisely what at least some members of the New York legislature intended: one Assemblyman predicted, in stating his support for the Act, that it would force sex offenders "out of town, out of state." (Assembly Minutes at 388–89).

Finally, the effect of the Act is to punish. Public notification results in an affirmative disability or restraint on sex offenders and their families. It interferes with the ability of sex offenders to rehabilitate in such a way as to extend their sentence, thereby increasing their punishment. Notification also serves traditional goals of punishment: retribution, incapacitation, and deterrence.

Defendants (and others) argue that to the extent sex offenders suffer adverse consequences as a result of the Act's public notification provisions, they have only themselves to blame. That may be true, but this reasoning only underscores the punitive underpinning of the Act: because of their crimes, sex offenders deserve whatever they get.

Likewise, the Act is premised on the generalization that sex offenders will repeat their crimes. As one member of the New York State Assembly proclaimed: "once a pedophile, always a pedophile." (Assembly Minutes, at 383). A society, or a legislature, may have a right to make that generalization as a matter of social policy, but a statutory scheme built upon a presumption that an entire group of individuals is incapable of rehabilitation is fundamentally punitive in nature.

The vision of a seven-year old child being raped and murdered by a twice-convicted sex offender who lived across the street, unbeknownst to the child's family, is a haunting one. With that vision in mind, one could justify, on an emotional level, virtually any punishment and virtually any punishment could be characterized as a mere protective or regulatory measure. Indeed, any balancing of the rights of children and others to be free from rape, murder, and sexual abuse against the rights of those convicted of committing those crimes will always result in a decisive tipping of the scales of justice in favor of the former.

Our Constitution, however, does not call for such a balancing in these circumstances. To the contrary, the Ex Post Facto Clause forbids all laws that increase punishment after the fact; there is no exception for laws that are based on good intentions or that seek to protect our children. If a law increases punishment, it cannot be applied retroactively even if it would also prevent further acts of violence and abuse.

The registration provisions of the Act, however, do not constitute punishment, for they do not result in the same excesses or adverse consequences that follow public notification. Hence, their retroactive application would not violate the Ex Post Facto Clause.

Accordingly, summary judgment is granted in favor of plaintiffs with respect to the notification provisions of the Act and in favor of defendants with respect to the registration provisions of the Act.

## STATEMENT OF THE CASE

### A. The Act

#### 1. Background

The Act was passed on July 25, 1995 and took effect on January 21, 1996. Its pream-

ble contains the following statement of the legislature's findings and intent:

> The legislature finds that the danger of recidivism posed by sex offenders, especially those sexually violent offenders who commit predatory acts characterized by repetitive and compulsive behavior, and ... the protection of the public from these offenders is of paramount concern or interest to government. The legislature further finds that law enforcement agencies' efforts to protect their communities, conduct investigations and quickly apprehend sex offenders are impaired by the lack of information about sex offenders who live within their jurisdiction and that the lack of information shared with the public may result in the failure of the criminal justice system to identify, investigate, apprehend and prosecute sex offenders.

The preamble goes on to state that "[t]he system of registering sex offenders is a proper exercise of the state's police power regulating present and ongoing conduct" and "will bring the state into compliance with the federal crime control act...." [1]

All 50 states have enacted sex offender registration laws, many of which also provide for public notification. *See People v. Ross,* —— Misc.2d ——, 646 N.Y.S.2d 249, 250 n. 1 (N.Y.Sup.Ct.N.Y.Co.1996) (citing statutes). The statutes resulted from growing public concern over the substantial threats presented by sex offenders and a belief that sex offenders as a group are more likely to repeat their crimes. In enacting these laws, legislatures have articulated two goals: (i) enhancing law enforcement authorities' ability to fight sex crimes and (ii) protecting communities, and particularly children, by notifying them of the presence of individuals who, because of their history of committing sex crimes, may present a danger.

Defendants have submitted statistics showing that approximately 133,000 women and girls age 12 and older are victims of rape or attempted rape in the United States each year. (Def. Mem. at 2–3). Justice Department statistics for 1992 show that nationwide 17,000 girls under age 12 were raped. (*Id.* at 3). Defendants cite studies that delineate the devastating psychological impact that sex offenses have on their victims. (*Id.* at 3–4). Defendants' statistics also show high rates of "recidivism among sex offenders, particularly among those who prey upon children" and that "[s]ex offenders are significantly more likely than other repeat offenders to reoffend with sex offenses or other violent crimes." (*Id.* at 4). As compared to other criminals, defendants contend, sex offenders have a higher propensity "to go for long periods of time between offenses (thereby giving the false impression of having been successfully rehabilitated)." (*Id.* at 4–5). Plaintiffs have not challenged these statistics and the propositions they support, and thus I accept them as true for purposes of these cross-motions.

### 2. *Registration*

Under the Act, a "sex offender" is any person convicted of a "sex offense" or a "sexually violent offense." § 168–a(1), (2), (3). These designations encompass 36 offenses, including attempts. Seven of the designated offenses are misdemeanors. (Stip. ¶ 16).[2]

---

1. In 1994, Congress enacted the Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Program, 42 U.S.C. §§ 14071(a)–(f) (the "Federal Act"). The Federal Act initially encouraged states, through funding incentives, to enact laws requiring individuals convicted of crimes against children or sexually violent offenses to register with state law enforcement agencies. The Federal Act also permitted law enforcement authorities to release certain information in certain limited circumstances. *Id.* at § 14071(d). Congress recently amended the Federal Act to provide, as an additional requirement of funding, that state and local law enforcement agencies *"shall* release relevant information that is necessary to protect the public concerning a specific person required

to register." Pub.L. No. 104–145, 110 Stat. 1345 (emphasis added) (to be codified at 42 U.S.C. § 14071(d)(2)).

2. References to "Stip." are to the parties' "Stipulation of Undisputed Facts," dated August 22, 1996.

"Sex offenses" include, for example, convictions for rape in the second or third degree, sodomy in the second or third degree, or sexual abuse in the second degree, and convictions for attempt thereof. § 168–a(2) (*citing* N.Y. Penal Law §§ 130.25, 130.30, 130.40, 130.45, 130.60 (McKinney 1987 & Supp.1996)). "Sexually violent offenses" include, for example, convictions for rape in the first degree, sodomy in the first

Sex offenders, including those incarcerated when the Act took effect, are required to register with the Division of Criminal Justice Services (the "DCJS") within 10 days after discharge, parole, or release. §§ 168–e(1), 168–f(1). Sex offenders who were "on parole or probation" on the effective date of the Act are also required to register. § 168–g(2). Sex offenders must register annually for ten years as well as "within ten calendar days prior to any change of address." §§ 168–f(2), (4), 168–h. A "[s]exually violent predator," defined as a person convicted of a "sexually violent offense" or a "sex offender" who suffers from a "mental abnormality" that makes him or her "likely to engage in predatory sexual conduct," must register annually and personally verify his or her registration at "the local law enforcement agency" every 90 days for at least ten years and potentially for life. §§ 168–a(7), 168–f(3), 168–h, 168–*l* (6)(c).

To register, sex offenders must provide such identifying information as name, date of birth, sex, race, height, weight, eye color, driver's license number, and home address. They must also provide a description of the offense, the date of conviction, and the sentence imposed as well as a photograph and fingerprints. §§ 168–b, 168–i. (*See* Stip. ¶ 17).

The failure to register as required by the Act is a crime. § 168–t. Since the Act took effect, at least six prosecutions have been brought in New York State against individuals who allegedly failed to register. (Stip. ¶ 45). Any sex offender required to register under the Act may petition the sentencing court to be relieved of the duty to register. § 168–o.

### 3. *Notification*

The Act provides for three levels of notification to law enforcement agencies and/or the public based on the risk of a "re-offense" and the danger to the public. § 168–*l* (6). Based on an offender's risk level, notification is made either to law enforcement agencies only or to "any entity with vulnerable populations." § 168–*l* (6)(b). The Act does not define the term "any entity with vulnerable populations," but the Act does provide that "[a]ny entity receiving information on a sex offender may disclose or further disseminate such information at [its] discretion." *Id.*

If the risk of a repeat offense is "low," the sex offender is assigned risk level one and only notification to law enforcement agencies is authorized. § 168–*l* (6)(a). If the risk of a repeat offense is "moderate," the offender is assigned risk level two and the police may disseminate to "any entity with vulnerable populations" an approximate address based on the sex offender's zip code, a photograph, and background information. If the risk of a repeat offense is "high," the offender is assigned risk level three and the police may disseminate the offender's "exact address." § 168–*l* (6)(c). Moreover, a level three offender is also to be included in a "subdirectory of sexually violent predators" that contains an exact address, other identifying information, and a photograph. The subdirectory, which will be available statewide, will have listings by county and zip code, with copies to be distributed annually to local police departments for public access. A written request will be required before access to the subdirectory is given. §§ 168–*l* (6)(c), 168–q.

Classification of a sex offender at level one, two, or three is determined by consideration of approximately 15 statutory factors that are used to assess the likelihood that an offense will be repeated. (Stip. ¶ 22, *citing* § 168–*l* ). In addition, the Board of Examiners of Sex Offenders is required to "develop guidelines and procedures to assess the risk of a repeat offense" and the "threat posed to public safety." (Stip. ¶ 28, *citing* § 168–*l* (5)).

Finally, identifying information about all registrants—whether level one, two, or three—also will be available to the public through a special "900" telephone number, which was scheduled to become operational on March 8, 1996. Callers to the 900 number will not be able to obtain information about any person unless they first provide some

degree, and sexual abuse in the first degree, and convictions for attempt thereof. § 168–a(3) (*cit-* 

*ing* N.Y. Penal Law §§ 130.35, 130.50, 130.65 (McKinney 1987 & Supp.1996)).

identifying information that reasonably identifies the person in question as a registrant. Moreover, the telephone calls will be recorded and callers will be required to identify themselves. § 168–p. The unauthorized release of any information is a crime. § 168–u. The registry may be made available "to any regional or national registry of sex offenders for the purpose of sharing information." § 168–b(2).

## B. *The Facts*

### 1. *Plaintiffs*

Plaintiff John Doe was convicted of attempted rape in the first degree in New York in 1990 and was sentenced to a period of incarceration. He was released on parole in 1994 and has remained on parole since then without incident. (Stip. ¶ 6). On February 5, 1996, while on parole, Doe received notification that he had been classified as a level three sex offender and that he was thus "subject to lifetime registration and ... must register quarterly." (Stip. ¶ 39). He was advised that he could petition the sentencing court to be relieved from registering, but not for "at least 10 years." (*Id.*).

Plaintiff Richard Roe was convicted of sexual abuse in the first degree in New York in 1995. He was sentenced to probation and has remained on probation without incident since then. (Stip. ¶ 7). Roe was also assigned risk level three. (Stip. ¶ 42).

Plaintiff Samuel Poe was convicted of attempted sodomy in the first degree in New York in 1989 and was sentenced to a period of incarceration. He presently is entitled to immediate conditional release from prison and will be paroled when the Division of Parole approves his residence. In accordance with the Act, he will be required to appear before the state court for classification prior to release on parole. (Stip. ¶ 8).

Plaintiffs sue on behalf of themselves as well as all others similarly situated—all persons who currently are (or in the future will be) incarcerated in a New York State prison or jail or on parole or probation after having been convicted of a "sex offense" or "sexually violent offense" as defined in the Act, committed prior to the effective date of the Act,

January 21, 1996, and who have been or will be subject to the Act's registration and notification provisions. (Cmplt. ¶ 35). I have not certified a class because defendants have agreed to be bound by any rulings in this case and to apply them to plaintiffs and all similarly situated sex offenders. (Stip. ¶ 4).

### 2. *Defendants*

Named as defendants in this lawsuit, in their official capacities, are Governor Pataki; Paul Shechtman, the Commissioner of DCJS; Brion Travis, Chairman of the Board of Parole of the New York State Division of Parole Services; George Sanchez, Director of the New York State Division of Probation; and Elizabeth M. Devane, Chairperson of the New York State Board of Examiners of Sex Offenders; and the New York State Board of Examiners of Sex Offenders. Defendants are the individuals responsible for the implementation of the Act and the agencies involved in its operation. (*See generally* Stip. ¶¶ 9–13, 27–29).

### 3. *Application of Sex Offender Laws*

In support of their prior motion for a preliminary injunction, plaintiffs submitted bits of anecdotal evidence detailing some of the effects that the Act and similar sex offender laws had on registrants. The parties have now significantly enhanced the record, and I have been provided with details, by stipulation and otherwise, of the results of application of the Act in New York and application of similar sex offender laws in New Jersey and other states. These facts are undisputed and may be summarized as follows:

### a. *New York*

Prior to the entry of the Court's temporary restraining order and preliminary injunction in this case, three convicted sex offenders in New York had been subjected to the Act's public notification provisions. (Stip. ¶ 46). The parties have stipulated as to the facts of those incidents as follows:

On January 29, 1996, the Westchester County District Attorney alerted the media that Joseph Rossillo, who had been convicted

for statutory rape and was scheduled to be sentenced to probation, would also receive a hearing to determine his classification level under the Act. Reporters kept a constant vigil outside Rossillo's home for several days. (Stip. ¶ 47).

On February 26, 1996, the superintendent of the Cornwall Central School District Community distributed a written notice that she had been advised of the release of an unnamed sex offender into that community from prison. After local newspapers published several articles about the release of a "sexually violent predator" into the community, police identified the individual as Mark Iannolo and released his exact street address and a photograph. Although his crime had been against an adult woman, Iannolo was branded in the community as a child molester. (Stip. ¶ 48).

On March 5, 1996, the superintendent of an upstate New York school district sent a mass mailing to all residents of the district after being informed by police that a sex offender had moved into the community following his release from prison. The letter identified the individual by name and specific street address. After the mailing, the individual was fired from his job, members of his family were harassed, his brother received "ominous, anonymous" telephone calls, and an attempt was made to break into his home. (Stip. ¶ 49).

#### b. *New Jersey*

The parties also stipulated as to the facts of the following incidents in New Jersey:

Carlos Diaz, a convicted sex offender, was literally driven out of town after a crowd of news vans, reporters, and members of the Guardian Angels set up a round-the-clock stakeout outside his mother's apartment, where he had been living. The Guardian Angels posted "wanted" posters for Diaz throughout the neighborhood and made public threats against Diaz and his family. Local politicians and community leaders also made statements condemning him and objecting to the presence of his family in the community. Eventually, after effectively having been held prisoner in her own apart-

ment for a week, Diaz's mother fled the home as well. (Stip. ¶ 55).

Another individual, who had been convicted in 1986 of a sex offense involving his 16–year old stepdaughter, was released from prison in 1995. Shortly thereafter, the local police circulated his name and photograph in the community with a statement that he posed a danger to children. After his neighbors started calling him a "child molester," his landlord locked him out of his apartment. He was physically attacked three times. (Stip. ¶ 57).

Other New Jersey sex offenders subjected to community notification suffered similar consequences: the loss of employment; threats of violence; property damage; being forced from their homes; and other public harassment. (Stip. ¶¶ 58, 61, 62, 63, 64). In addition, the mother-in-law of a convicted sex offender was intimidated on two occasions by strangers who attempted to force their way into her home while demanding information about the whereabouts of the sex offender and his family. (Stip. ¶ 59).

Finally, in perhaps the most bizarre incident in New Jersey, two men broke into a house that police had identified as the home of a convicted sex offender. They attacked the wrong man—a visitor who was spending the night in the house. He suffered serious injuries to his shoulder, neck, and back, and because of the resulting publicity and mistaken impression that he was a sex offender, he lost his business. Moreover, his children and fiancee were ridiculed and harassed. (Stip. ¶ 56).

The United States, as *amicus curiae*, has submitted evidence of instances in which community notification in New Jersey might have prevented released sex offenders from repeating their crimes. (Alter Aff., Exh. F). In one incident, a teacher's aide who had learned about the presence in the community of a released convicted sex offender called the police to report that the individual had been in contact with a child. After investigating, the police learned that the individual had attended a child's birthday party and had invited a nine-year old to his home for ice cream. These activities violated the individual's conditions of parole and his parole

was revoked as a result. (Alter Aff., Exh. F at ¶ 4).

There were at least two other incidents in which released convicted sex offenders violated the terms of their parole by being in the company of children. These violations were brought to the attention of the authorities as a result of community notification. (Alter Aff., Exh. F at ¶¶ 5, 7).

### c. *Washington*

The parties also stipulated as to a series of events in the State of Washington:

In 1993, soon after police disclosed that Joseph Gallardo, who had been convicted of raping a 10–year old girl, was about to be released from prison, his home was burned to the ground by an arsonist. He relocated to New Mexico, but after Washington police notified his new community of his presence, he was forced to move again. (Stip. ¶ 50).

Another Washington sex offender was evicted from the trailer park where he resided after he had become the object of a campaign of harassment and intimidation. He thereafter was forced to leave a second community after citizens there posted fliers with his photograph. He lost three jobs before he was forced to leave Washington State. (Stip. ¶ 51).

The adoptive family of a 12–year old who had been classified as a "sexual predator" was evicted from its home after the child was released from a juvenile facility. (Stip. ¶ 51). Two other sex offenders were forced to relocate by residents of Tacoma, Washington. (Stip. ¶ 52). A Washington gas station that employed a sex offender became the target of a boycott by persons who urged customers to stay away because a "[s]ex offender works here." (Stip. ¶ 54).

Finally, in another incident, after police notification of a sex offender's presence in a community, private citizens circulated posters bearing the individual's picture. The police characterized the posters as having a "vigilante edge." The individual was thereafter attacked by a stranger who knocked on his door, called him a "pervert," and punched him in the mouth. (Stip. ¶ 53).

In addition to the facts set forth in the Stipulation, the United States submitted a report, published in December 1993, on Washington's Community Notification Law. (Alter Aff., Exh. A) (the "Washington Report"). The Washington State Institute for Public Policy surveyed sheriffs in all 39 of Washington's counties as well as the chiefs of police of Washington's ten largest cities in March 1993. Some 88 percent responded. The Washington Report shows that in the first three years of the law, 14 acts of harassment had been directed at released sex offenders (and in half of those incidents, at their families or friends as well) following notification. (pp. ii, 7).

### d. *California*

California has been operating a 900 telephone service that provides information about its registered sex offenders since January 1995. (Stip. ¶¶ 65, 66). There are approximately 46,000 sex offenders registered under the California Child Protective Act of 1994 as individuals who may victimize children. (Stip. ¶¶ 66, 68). Certain precautions have been implemented in an effort to prevent abuse of any information provided through the 900 number. (Stip. ¶¶ 69–72). California also maintains a publicly available subdirectory of some 900 high risk sex offenders. (Stip. ¶ 80–81). Fewer than ten complaints have been received about California's program, and most have been from registrants. (Stip. ¶ 84). The California Department of Justice has not received any reports from law enforcement indicating that the disclosure of any information about a sex offender has been followed by acts of harassment or discrimination or the commission of a crime against the registrant. (Stip. ¶ 86).

### e. *Oregon*

Although the parties did not stipulate as to any facts concerning application of a sex offender law in Oregon, the United States submitted a report, published by the Oregon Department of Corrections in January 1995, on "Sex Offender Community Notification in Oregon." (Alter Aff., Exh. B) (the "Oregon Report"). The Oregon Report concludes:

Although there has been some harassment of offenders, only a few problems have been experienced. Most results have been positive. The notification process has improved community communication. It has also provided motivation for many offenders to more actively participate in treatment.

(p. 5). The Oregon Report recommends that "Community Notification should continue . . . ." (p. 6).

The Oregon Report notes that less than 10% of the offenders were reported to have experienced "some form of harassment," which included "name calling, graffiti, toilet papering and minor property vandalism, monitoring of a home by a video camera, repeated reports of unfounded violations to parole/probation officers, and picketing of residences." (p. 12). Two "extreme" cases were reported: one sex offender had a gun pointed at him and another was falsely accused of slashing someone's tires and was threatened with having his house burned down. (*Id.*). One sex offender committed suicide after he was informed that community notification would occur; although the Oregon Report states that "[i]t is unclear whether notification caused his suicide," it also notes that the suicide occurred just ten days after notification. (p. 13).

Finally, the Oregon Report noted other circumstances that apparently were not included in the harassment category noted above:

> Community notification has made it more difficult to find residences for some sex offenders released from prison. Release plans have fallen apart just before release, leaving no time to develop appropriate alternate placements. Convicted sex offenders have been asked to move out by those they live with or have been evicted by landlords. Relatives are less willing to allow a convicted sex offender to reside with them once there is awareness that notification will occur. Some offenders, because of harassment, have chosen to

move to new neighborhoods. Community transition programs, halfway houses, and other supervised placements, similarly have become more reluctant to take in sex offenders. Because these programs want to maintain a low profile in the community, they will not allow placement of a high profile sex offender, fearing that the publicity will bring the program into the public eye and force closure of the programs.

> . . . .

> Notification has [a]ffected employment opportunities for sex offenders. . . .

> Businesses who were initially willing quietly to employ a sex offender sometimes do not provide jobs when the hiring will clearly become public. . . .

(pp. 13–14).

## C. *Prior Proceedings*

This case was filed on March 6, 1996, two days before New York's 900 telephone number service was to become operational. Plaintiffs immediately moved by order to show cause for a preliminary injunction and a temporary restraining order. On March 7, 1996, after hearing preliminary arguments on the issues raised by plaintiffs' motion, I issued a temporary restraining order, enjoining defendants from enforcing the notification provisions of the Act.

On March 18, 1996, I heard full arguments on the motion for a preliminary injunction. At the conclusion of the hearing, I continued the restraining order pending a decision on plaintiffs' motion for a preliminary injunction.

On March 21, 1996, I decided the motion and held that the Act's notification provisions were punitive in nature. I issued a preliminary injunction enjoining their retroactive application pending the outcome of this lawsuit. *Doe v. Pataki*, 919 F.Supp. 691, 693, 700–02 (S.D.N.Y.1996).[3] I declined, however, to enjoin retroactive application of the Act's registration provisions because I did not believe that plaintiffs would suffer irreparable

---

**3.** Defendants have advised the Court of their intent to implement the public notification provisions of the Act with respect to individuals who committed their offenses *after* January 21, 1996. (Letter from Assistant Attorney General Rose-

mary DiBenedetto, dated August 28, 1996). Of course, my preliminary injunction only enjoined enforcement of the public notification provisions against individuals whose crimes were committed *before* the Act took effect.

harm if they were simply required to register. *Id.* at 693, 698.

My decision was not appealed. Instead, the parties conducted expedited discovery. These cross-motions for summary judgment followed.

### DISCUSSION

Plaintiffs contend that the Act, as applied to individuals convicted of sex offenses prior to its passage, violates the Ex Post Facto Clause of the United States Constitution. In addition, they contend that the Act has been applied to individuals who were on parole or probation when the Act became effective in a manner that is inconsistent not only with the terms of the Act but also with the Due Process Clause. I will address first the Ex Post Facto claim and then the statutory and Due Process claims.

### A. The Ex Post Facto Claim

The Ex Post Facto Clause invalidates legislative measures that "retroactively ... increase the punishment for criminal acts." *See California Dep't of Corrections v. Morales*, —— U.S. ——, ——, 115 S.Ct. 1597, 1601, 131 L.Ed.2d 588 (1995) (*quoting Collins v. Youngblood*, 497 U.S. 37, 43, 110 S.Ct. 2715, 2719–20, 111 L.Ed.2d 30 (1990)). There is no dispute that the Act applies retroactively. Thus, the central question is whether the Act increases the punishment for sex offenses or whether, as defendants contend, the Act simply regulates and protects.

To analyze the issue, I will first review the definition and purposes of punishment and the purposes of the Ex Post Facto Clause. I will then review the case law on the constitutionality of sex offender registration and notification laws as well as on the question of "punishment" in other contexts to identify the factors that must be considered in determining whether government regulatory action constitutes punishment. Finally, I will apply these considerations and factors to the notification and registration provisions of the Act.

### 1. Punishment

■ In the most basic terms, punishment is, in the context of the justice system, the imposition of a penalty—a suffering in right, person, or property—for the commission of a crime. *See Farmer v. Brennan*, 511 U.S. 825, ——, 114 S.Ct. 1970, 1988, 128 L.Ed.2d 811 (1994) (Blackmun, J., concurring). Traditionally, punishment has been considered to have four purposes: retribution, deterrence, rehabilitation, and incarceration (sometimes referred to as incapacitation or protection). *See generally United States v. Brown*, 381 U.S. 437, 458, 85 S.Ct. 1707, 1720, 14 L.Ed.2d 484 (1965) ("Punishment serves several purposes; retributive, rehabilitative, deterrent—and preventative."); *see also Trop v. Dulles*, 356 U.S. 86, 111, 78 S.Ct. 590, 603–04, 2 L.Ed.2d 630 (1958) (Brennan, J., concurring) ("[R]ehabilitation is but one of the several purposes of the penal law. Among other purposes are deterrents of the wrongful act by the threat of punishment and insulation of society from dangerous individuals by imprisonment or execution."); Toni M. Massaro, *Shame, Culture, and American Criminal Law,* 89 Mich.L.Rev. 1880, 1890 (1991) ("Classical penology identifies four ends of punishment of criminal offenders: retribution, rehabilitation, deterrence, and incapacitation.").

The goal of retribution is to give the offender what he "deserves." *See generally* H.L.A. Hart, *Punishment and Responsibility* 233–35 (1968); H. Packer, *The Limits of the Criminal Sanction* 38 (1968); Black's Law Dictionary at 1317 (6th ed. 1990) (retribution as a theory of punishment is "based strictly on the fact that every crime demands payment in the form of punishment"). In doing so, the punishment satisfies a societal need to avenge the harm, rather than a desire to rehabilitate or deter the offender. As Justice Stewart wrote in his concurrence in *Furman v. Georgia,*

> The instinct for retribution is part of the nature of man, and channelling that instinct in the administration of criminal justice serves an important purpose in promoting the stability of a society governed by law.

408 U.S. 238, 308, 92 S.Ct. 2726, 2761, 33 L.Ed.2d 346 (1972).

## 2. *The Ex Post Facto Clause*

Article I, § 10, of the Constitution forbids the States from enacting any "ex post facto Law." The Supreme Court first interpreted this phrase in *Calder v. Bull,* 3 U.S. (3 Dall.) 386, 1 L.Ed. 648 (1798). There, Justice Chase explained that the Ex Post Facto Clause prohibited state governments from passing laws that had the effect of punishing citizens for conduct after the fact. Specifically, Justice Chase noted four types of laws that the Ex Post Facto Clause prohibited:

> 1st. Every law that makes an action done before the passing of the law, and which was *innocent* when done, criminal; and punishes such action. 2d. Every law that *aggravates a crime,* or makes it *greater* than it was, when committed. 3d. Every law that *changes the punishment,* and inflicts a *greater punishment,* than the law annexed to the crime, when committed. 4th. Every law that alters the *legal* rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, *in order to convict the offender.*

*Id.* 3 U.S. (3 Dall.) at 390. Here, plaintiffs argue that the Act offends the third prong of Justice Chase's formulation and contend that the Act changed the punishment for certain sex crimes, inflicting greater punishment than what existed when these crimes were committed.

The definition of ex post facto laws has remained relatively constant through time and has been repeatedly reaffirmed by the Supreme Court. *See, e.g., Collins v. Young-blood,* 497 U.S. 37, 42, 110 S.Ct. 2715, 2719, 111 L.Ed.2d 30 (1990); *Beazell v. Ohio,* 269 U.S. 167, 169–70, 46 S.Ct. 68, 68–69, 70 L.Ed. 216 (1925); *Fletcher v. Peck,* 10 U.S. (6 Cranch) 87, 138, 3 L.Ed. 162 (1810). Indeed, this prohibition against ex post facto laws was critically important to the drafters of our Constitution and remains a fundamental "constitutional bulwark in favor of personal security and private rights." The Federalist No. 44, at 301 (James Madison).

Prohibitions against ex post facto laws date as far back as the time of the ancient Greeks. As Justice Scalia has explained, "the presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic." *Landgraf v. USI Film Products,* 511 U.S. 244, —— n. 17, 114 S.Ct. 1483, 1497 n. 17, 128 L.Ed.2d 229 (1994) (*quoting Kaiser Aluminum & Chemical Corp. v. Bonjorno,* 494 U.S. 827, 842–44, 855–56, 110 S.Ct. 1570, 1579–81, 1586–87, 108 L.Ed.2d 842 (1990) (Scalia, J., concurring)). In *Kaiser Aluminum,* Justice Scalia wrote:

> The principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal human appeal. It was recognized by the Greeks, *see* 2 P. Vinogradoff, *Outlines of Historical Jurisprudence* 139–140 (1922), by the Romans, *see Justinian Code,* Book 1, Title 14, § 7, by English common law, *see* 3 H. Bracton, *De Legibus et Consuetudinibus Angliae* 531 (T. Twiss trans. 1880); Smead, 20 Minn.L.Rev., at 776–778, and the Code of Napoleon, Prelim. Title, Art. I, cl. 2 (B. Barrett trans. 1811). It has long been a solid foundation of American law.

*Id.* at 855, 110 S.Ct. at 1586.

■ The Ex Post Facto Clause serves two basic purposes. First, the clause is designed to ensure that legislative acts " 'give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed.' " *Miller v. Florida,* 482 U.S. 423, 430, 107 S.Ct. 2446, 2451, 96 L.Ed.2d 351 (1987) (*quoting Weaver v. Graham,* 450 U.S. 24, 28–29, 101 S.Ct. 960, 963–965, 67 L.Ed.2d 17 (1981)). This purpose has little to do with people actually changing their behavior; rather, it stems from the basic constitutional principle that it is fundamentally fair for people to know the law before they act. "Elementary considerations of fairness dictate that individual should have *an opportunity* to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted." *Landgraf,* 511 U.S. at ——, 114 S.Ct. at 1497 (emphasis added). Thus, fundamental fairness dictates that individuals are entitled to

the opportunity to know the law before they act; it is simply irrelevant, for constitutional purposes, whether people actually change their behavior.

Second, the clause is designed to prevent legislatures from imposing arbitrary or vindictive legislation on individuals or classes of individuals. *Miller*, 482 U.S. at 429, 107 S.Ct. at 2450–51; *Weaver*, 450 U.S. at 29, 101 S.Ct. at 964–65; *see also James v. United States*, 366 U.S. 213, 247 n. 3, 81 S.Ct. 1052, 1070 n. 3, 6 L.Ed.2d 246 (1961) (Harlan, J., concurring in part and dissenting in part); *Malloy v. South Carolina*, 237 U.S. 180, 183, 35 S.Ct. 507, 508, 59 L.Ed. 905 (1915). As the Court stated in *Weaver*:

> The presence or absence of an affirmative, enforceable right is not relevant ... to the *ex post facto* prohibition, which forbids the imposition of punishment more severe than the punishment assigned by law when the act to be punished occurred. Critical to relief under the *Ex Post Facto* Clause is not an individual's right to less punishment, but the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated. Thus, even if a statute merely alters penal provisions accorded by the grace of the legislature, it violates the Clause if it is both retrospective and more onerous than the law in effect on the date of the offense.

*Weaver*, 450 U.S. at 30, 101 S.Ct. at 965 (footnote omitted). Thus, the Ex Post Facto Clause provides a check against legislative abuses. Specifically, it prevents legislatures from responding to political pressures to impose retroactive legislation to harm unpopular groups. *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 513, 109 S.Ct. 706, 732, 102 L.Ed.2d 854 (1989) (Stevens, J., concurring). Also, it prevents legislatures from "sweep[ing] away settled expectations suddenly and without individualized consideration." *Landgraf*, 511 U.S. at ——, 114 S.Ct. at 1497.

The purposes of the Ex Post Facto Clause are important not just from the point of view of the individuals subjected to retroactive punishment; rather, they are important to society as a whole. As Justice Stein stated in his dissent in *Doe v. Poritz*, 142 N.J. 1, 662 A.2d 367 (1995):

> The Constitution's prohibition against *ex post facto* laws reflects an enduring value that transcends the most pressing concerns of this or any day and age. Today, our concern is with prior sex offenders; in the 1950's the legislative concern focused on Communists; and in the 1860's Congress was determined to punish legislatively those who had supported the Confederacy. Future legislatures will doubtlessly find reasons to deal harshly with other groups that pose an apparent threat to the public safety.

*Id.* at 441. *See also Cummings v. Missouri*, 71 U.S. (4 Wall) 277, 322, 18 L.Ed. 356 (1866) (Ex Post Facto Clause was adopted because "'the framers of the Constitution viewed with some apprehension the violent acts which might grow out of the feelings of the moment ... the people of the United States, in adopting that instrument, have manifested a determination to shield themselves and their property from the effects of those sudden and strong passions to which men are exposed'") (*quoting Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 137–38, 3 L.Ed. 162 (1810)).

For all these reasons, the Ex Post Facto Clause requires courts to give careful consideration to any retroactive legislation.

### 3. The Case Law on Government Action as "Punishment"

In analyzing whether the Act is "punitive," two groups of cases must be reviewed: (a) the cases deciding the constitutionality of sex offender registration and notification laws and (b) the cases addressing whether other types of government action constituted "punishment" for purposes of the Ex Post Facto Clause and other constitutional provisions, including the Double Jeopardy Clause.

#### a. The Megan's Law Decisions

Sex offender registration and notification laws have been the subject of much litiga-

tion.[4] Numerous state court decisions have been issued, *e.g.*, *State v. Myers*, 260 Kan. 669, 923 P.2d 1024 (1996) (upholding registration but holding that public disclosure provisions constituted punishment for purposes of Ex Post Facto Clause); *Doe v. Poritz*, 142 N.J. 1, 662 A.2d 367 (1995) (upholding both registration and notification provisions of New Jersey Megan's Law); *State v. Ward*, 123 Wash.2d 488, 869 P.2d 1062 (1994) (upholding Washington registration law); *Louisiana v. Babin*, 637 So.2d 814 (La.Ct.App. 1994) (striking down Louisiana community notification law as an ex post facto law); *State v. Noble*, 171 Ariz. 171, 829 P.2d 1217 (1992) (upholding Arizona registration law), including one by the Supreme Court of the State of New York, Monroe County, upholding the Act in all respects. *People v. Afrika*, 168 Misc.2d 618, 648 N.Y.S.2d 235 (N.Y.Sup. Ct. Monroe Co. 1996).

Seven federal decisions on the issue of retroactive application of sex offender registration and notification laws have been brought to my attention. Only three of the cases discussed the issue of whether registration constituted punishment for purposes of the Ex Post Facto Clause and all three held that it did not. *Artway v. Attorney General of New Jersey*, 81 F.3d 1235, 1253–67 (3d Cir.1996); *Artway v. Attorney General of New Jersey*, 876 F.Supp. 666, 688 (D.N.J. 1995), *aff'd in part and vacated in part*, 81 F.3d 1235 (3d Cir.1996); *Rowe v. Burton*, 884 F.Supp. 1372, 1377–80 (D.Alaska 1994).

All seven decisions considered the issue of whether public notification constitutes "punishment" for purposes of the Ex Post Facto

Clause, and they reached differing results. Two district judges concluded that public notification is *not* punishment. *W.P. v. Poritz*, 931 F.Supp. 1199 (D.N.J.1996) (granting summary judgment dismissing complaint);[5] *Stearns v. Gregoire*, No. C95–1486D, slip op. (W.D.Wash. Apr. 12, 1996) (denying motion for preliminary injunction). Two district judges squarely concluded that public notification *is* punishment. *Roe v. Office of Adult Probation*, 938 F.Supp. 1080 (D.Conn.1996) (granting motion for preliminary injunction); *Artway v. Attorney General of New Jersey*, 876 F.Supp. at 688–93 (granting motion for preliminary injunction). A third district judge appears to agree that public notification constitutes punishment, although he has issued two decisions, one granting a preliminary injunction and the second denying a preliminary injunction. *Nitz v. Otte*, No. A95–486 CI, slip op. (D.Alas. Jan. 24, 1996) (denying motion for preliminary injunction on grounds that balancing of hardships tipped against plaintiff in favor of the public); *Rowe v. Burton*, 884 F.Supp. at 1380 (granting motion for preliminary injunction).

The only circuit court to consider the issue of retroactive application of a sex offender registration and notification statute is the Third Circuit. In *Artway*, the court upheld the registration provisions of New Jersey's Megan's Law. It did not reach the constitutionality of the notification provisions, however, because it concluded that the issue was not ripe. *Id.* at 1251. Nonetheless, the court set forth a three-prong test for determining whether a government regulatory scheme was punitive or regulatory.[6] In dic-

---

**4.** They have also been the subject of numerous law review articles. *See, e.g.,* Michele L. Earl-Hubbard, *The Child Sex Offender Registration Laws: The Punishment, Liberty Deprivation, And Unintended Results Associated with the Scarlet Letter Laws of the 1990s*, 90 Nw.U.L.Rev. 788 (1996); G. Scott Rafshoon, *Community Notification Of Sex Offenders: Issues Of Punishment, Privacy And Due Process*, 44 Emory L.J. 1633 (1995); Lori N. Sabin, *Doe v. Poritz: A Constitutional Yield To An Angry Society*, 32 Cal.W.L.Rev. 331 (1996); Simeon Schopf, *"Megan's Law": Community Notification And The Constitution*, 29 Colum.J.L. & Soc.Probs. 117 (1995); Note, *Prevention Versus Punishment: Toward A Principled Distinction In The Restraint of Released Sex Offenders*, 109 Harv.L.Rev. 1711 (1996).

**5.** The district court vacated a temporary restraining order that it had previously issued restraining retroactive application of the New Jersey Megan's Law. On July 9, 1996, the Third Circuit stayed the district court's order, thus leaving the prior temporary restraining order in effect.

**6.** The court's test was as follows: "A measure must pass a three-prong analysis—(1) actual purpose, (2) objective purpose, and (3) effect—to constitute non punishment." 81 F.3d at 1263. The first prong focuses simply on the legislature's subjective intent—was the measure meant to punish or is an restriction simply incident to the regulation. *Id.* The second prong contains three subparts. First, whether the law can be

tum the court observed that the plaintiff had "marshal[ed] strong reasons that notification would have devastating effects." *Id.* at 1266.

The cases take different approaches to analyzing whether the sex offender statutes in question constituted punishment. Virtually all, however, examine factors that can be grouped into four general areas: (a) the legislative intent, *i.e.*, whether the intent of the legislature, viewed both subjectively and objectively, was to punish; (b) the design of the statute, *i.e.*, whether the statute is designed and structured in a manner that suggests it is punitive; (c) the historical treatment of the measure in question, *i.e.*, whether comparable measures historically were considered to be punishment; and (d) the effects of the law, *i.e.*, whether the law has the effect of punishing. *See, e.g., Artway,* 81 F.3d at 1263; *Roe v. Office of Adult Probation,* 938 F.Supp. at 1088–92; *W.P. v. Poritz,* 931 F.Supp. at 1209; *Doe v. Poritz,* 662 A.2d at 404–06; *People v. Afrika,* 648 N.Y.S.2d at 238–41.

Because I conclude that public notification is punishment, it is important that I consider carefully the reasoning of the cases that hold that public notification does *not* constitute punishment. These cases rely on some common themes, which are echoed by defendants and *amici* in their briefs on these cross-motions.

First, these courts conclude that, viewed subjectively and objectively, notification statutes are "remedial" laws that are not motivated by "punitive, penal purposes." *W.P. v. Poritz,* 931 F.Supp. at 1214; *see also, e.g., Doe v. Poritz,* 662 A.2d at 404 ("legislative intent [behind Megan's Law] ... is clearly and totally remedial"). These courts rely heavily on their conclusion that these laws serve "significant remedial goals," including

as the "primary focus ... the protection of children and others from previously-convicted sex offenders, near them in the community, who have been found to have a moderate or high risk of re-offense." *W.P. v. Poritz,* 931 F.Supp. at 1214; *accord Stearns v. Gregoire,* slip op. at 13 (holding, on motion for preliminary injunction, that balance of hardships tipped in favor of public).

Second, these courts also conclude that the laws are narrowly designed to limit the circumstances under which information may be released and to prevent the abuse of information that is released. *W.P. v. Poritz,* 931 F.Supp. at 1212–13; *Stearns v. Gregoire,* slip op. at 9 ("the overall design and effect of the [Washington] statute indicate a non-punitive purpose"); *Doe v. Poritz,* 662 A.2d at 422 ("Here government has done all it can to confine [the] impact [of notification on offenders], allowing it only where clearly necessary to effect public safety...").

Third, these courts distinguish community notification from the "historical shaming punishments," such as public flogging and "branding" with a "Scarlet Letter," on the basis that "Megan's Law is not the product of a lust for retribution; it is a measured attempt to achieve remedial with attendant deterrent goals." *W.P. v. Poritz,* 931 F.Supp. at 1217; *accord People v. Afrika,* 648 N.Y.S.2d at 240.

Fourth, in considering the effects that notification laws have on sex offenders, these courts give little weight to the harsh results that resulted from notification because in their view such reactions were "not created by the registration and notification provisions of the sexual offenders registration law, but rather by the community's reaction to plaintiffs' prior conduct." *Stearns v. Gregoire,* slip op. at 10.[7] Indeed, these courts have

---

explained solely by a remedial purpose; second, under a historical analysis, has the imposition traditionally been considered punishment; and third, if a law serves both punitive and regulatory goals, whether the punitive component historically complements the regulatory component and whether the measure operates in its "usual" manner consistent with this historically mixed purpose. *Id.* The third prong considers the effects of the measure—"[i]f the negative repercussions—regardless of how they are justified—

are great enough, the measure must be considered punishment." *Id.*

7. *See also W.P. v. Poritz,* 931 F.Supp. at 1211–12 (the "few highly publicized incidents of vigilantism involving assault, arson, and death threats against sex offenders following notification" could not be included "within the statutory bounds of Megan's Law"); *Doe v. Poritz,* 662 A.2d at 376 ("This Court has no right to assume that the public will be punitive when the Legisla-

relied heavily on the fact that much of the information disclosed through the public notification provisions was already available to the public through other means. *Id.* at 9–10 (public notification provisions do not create an "affirmative restraint or disability" because existing Washington law already permitted dissemination of conviction records); *People v. Afrika,* 648 N.Y.S.2d at 240 ("criminal convictions are matters of public record"). These cases also conclude that a regulatory scheme is not rendered punitive merely because it results in some negative repercussions. *See Doe v. Poritz,* 662 A.2d at 388; *accord W.P. v. Poritz,* 931 F.Supp. at 1212–13, 1218–19; *Stearns v. Gregoire,* slip op. at 10–11; *People v. Afrika,* 648 N.Y.S.2d at 240.

Although the cases that have held that notification is not punishment do consider other factors, they rely most heavily on one factor—legislative intent. The cases repeatedly emphasize that the purpose of these laws is not to punish, but to protect. *See, e.g., People v. Afrika,* 648 N.Y.S.2d at 241 ("Vigilance without vengeance . . . against those who have proven to be threats to society does not embody punishment.").

#### b. *Other "Punishment" Decisions*

Over the years the Supreme Court has struggled with the issue of whether other types of governmental action constituted "punishment," not only in the context of the

Ex Post Facto Clause but also in the contexts of the Double Jeopardy Clause, the Excessive Fines Clause, and the Fifth and Sixth Amendment safeguards for individuals subjected to proceedings of a punitive nature. The Supreme Court's most recent decision on the subject of whether government action constituted "punishment" is *United States v. Ursery,* —— U.S. ——, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996), decided on June 24, 1996, on which defendants and *amici* heavily rely.[8]

In *Ursery,* the Supreme Court held that civil forfeiture was not "punishment" for purposes of the Double Jeopardy Clause. —— U.S. at ——, 116 S.Ct. at 2149. In reaching this conclusion, the Court applied a two-stage analysis. First, it reviewed Congress' intent in creating the civil forfeiture statute. Second, it analyzed " 'whether the statutory scheme was so punitive either in purpose or effect as to negate' Congress' intention to establish a civil remedial mechanism." *Id.* at ——, 116 S.Ct. at 2142 (*quoting United States v. Ward,* 448 U.S. 242, 248–49, 100 S.Ct. 2636, 2641–42, 65 L.Ed.2d 742 (1980)).[9]

The Court took particular care in distinguishing three earlier cases that had addressed the definition of punishment. *See* —— U.S. at —— - ——, 116 S.Ct. at 2142–47 (*discussing Dep't of Revenue of Montana v. Kurth Ranch,* 511 U.S. 767, 114 S.Ct. 1937, 128 L.Ed.2d 767 (1994)); *Austin v. United States,* 509 U.S. 602, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993); *United States v. Halper,* 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989).[10] Specifically, the Court

---

ture was not, that the public, instead of protecting itself as the laws intended, will attempt to destroy the lives of those subject to the laws. . . .").

**8.** In *Artway,* the Third Circuit addressed the issues without the benefit of the Supreme Court's decision in *Ursery.* In *W.P. v. Poritz,* the district court declined to follow the approach adopted by the Third Circuit in *Artway* largely because it believed that *Ursery* "alters the analysis" to be employed in considering the issue of whether public notification constitutes punishment. 931 F.Supp. at 1207–08.

**9.** The Second Circuit recently applied *Ursery* in holding that civil forfeiture was not criminal or punitive for purposes of the Ex Post Facto Clause. *United States v. Certain Funds,* 96 F.3d 20 (2d Cir.1996). Although *Ursery* was a Double

Jeopardy Clause case, the Second Circuit held that its analysis was "equally applicable" to the issue in the context of the Ex Post Facto Clause. *Id.* at 26–27.

**10.** In *Kurth Ranch,* the Court held that a tax imposed on the possession of illegal drugs constituted "punishment" for purposes of the Double Jeopardy Clause. 511 U.S. at ——, 114 S.Ct. at 1948. In *Austin,* the Court concluded that the *in rem* forfeiture of property used in illegal narcotics transaction was "punishment" for purposes of the Excessive Fines Clause of Eighth Amendment, which limits the government's "power to punish" by prohibiting the imposition of "excessive fines" as punishment. 509 U.S. at 608–10, 622, 113 S.Ct. at 2804–06, 2812. Finally, in *Halper,* the Court held that a civil penalty imposed under the False Claims Act may constitute

addressed the impact of these cases on its "traditional understanding that civil forfeiture does not constitute punishment for the purpose of the Double Jeopardy Clause." *Id.* —— U.S. at ——, 116 S.Ct. at 2147. After reviewing each case in detail, it concluded that these cases had not altered settled precedent holding that "*in rem* civil forfeitures are neither 'punishment' nor criminal for purposes of the Double Jeopardy Clause." —— U.S. at ——, 116 S.Ct. at 2149.[11]

In reaching its holding, the Court emphasized three factors in particular. First, it noted that civil forfeiture historically had not been regarded as punishment. *Id.* at ——, ——, 116 S.Ct. at 2147, 2149; *see also Gomez v. United States*, 1996 WL 406781, No. CV–95–1020, at *2 (E.D.N.Y. July 3, 1996) (noting the Court's emphasis on historical nature of civil forfeiture). Second, it contrasted the *in rem* nature of civil forfeiture with the *in personam* proceedings at issue in the other "punishment" cases. *Ursery*, —— U.S. at ——, 116 S.Ct. at 2141; *see also United States v. Reyes*, 87 F.3d 676, 682 n. 8 (5th Cir.1996) ("The *Ursery* opinion ... gives heavy emphasis to the *in rem* nature of the forfeitures there at issue, and distinguishes *Halper* and *Kurth Ranch* largely because those cases involved *in personam* proceedings."). Third, it found that, while having certain punitive aspects, civil forfeiture served important nonpunitive goals. *Ursery*, —— U.S. at ——, 116 S.Ct. at 2148.[12]

Another important Supreme Court case relied on by defendants is *De Veau v. Braisted*, 363 U.S. 144, 80 S.Ct. 1146, 4 L.Ed.2d 1109 (1960). There, a New York statute prohibited waterfront unions from collecting union dues if any officer was a convicted felon. Consequently, unions that had employed convicted felons prior to the law's passage were required to discharge them if they wished to continue collecting dues. The statute was attacked as an ex post facto law, and the issue presented was whether the statute was punitive. The Court concluded that it was not, holding:

> The mark of an ex post facto law is the imposition of what can fairly be designated punishment for past acts. The question in each case where unpleasant consequences are brought to bear upon an individual for prior conduct, is whether the legislative aim was to punish that individual for past activity, or whether the restriction of the individual comes about as a relevant incident to a regulation of a present situation, such as the proper qualifications for a profession.... The proof is overwhelming that New York sought not to punish ex-felons, but to devise what was felt to be a much-needed scheme of regulation of the waterfront, and for the effectuation of that scheme it became important whether individuals had previously been convicted of a felony.

363 U.S. at 160, 80 S.Ct. at 1155. As defendants point out, other statutes that imposed restrictions on convicted felons after the fact also have survived ex post facto challenges. *See, e.g., Bae v. Shalala*, 44 F.3d 489, 493–96 (7th Cir.1995) (holding that provisions of Generic Drug Enforcement Act debarring convicted felons from participating in generic drug industry are remedial and not punitive);

---

"punishment" for purposes of the Double Jeopardy Clause if the penalty is so disproportionate that it "may not fairly be characterized as remedial, but only as a deterrent or retribution." 490 U.S. at 448–49, 109 S.Ct. at 1902.

**11.** The Court distinguished *Kurth Ranch* by concluding that the tax proceeding at issue there was different from an *in rem* civil forfeiture. —— U.S. at —— — ——, 116 S.Ct. at 2144–47. It distinguished *Austin* by concluding that the Excessive Fines Clause at issue there presented issues different from those presented by the Double Jeopardy Clause. —— U.S. at —— — ——, 116 S.Ct. at 2146–47. It distinguished *Halper* by concluding that *in personam* civil penalties were different from *in rem* civil forfeitures. —— U.S. at ——, 116 S.Ct. at 2144.

**12.** While *Ursery* is helpful and must, of course, be carefully considered, it does not mandate a finding that the Act is regulatory and not punitive. Indeed, if anything, *Ursery* supports the conclusion that notification is punitive, for the Court emphasized, repeatedly, that civil forfeiture was an *in rem* proceeding brought against property. The Court contrasted *in rem* forfeiture proceedings with punitive or potentially punitive *in personam* proceedings. —— U.S. at —— — ——, 116 S.Ct. at 2140–41, 2142, 2147. The Act, of course, is very much an *in personam* measure that operates against the person.

*United States v. Huss,* 7 F.3d 1444, 1447–48 (9th Cir.1993) (Oregon law that retroactively revoked right of a convicted felon to carry "long guns" was not punitive but furthered substantial and legitimate safety interests); *Wiley v. Bowen,* 824 F.2d 1120, 1122 (D.C.Cir.1987) (retroactive application of amendment to Social Security Act terminating eligibility of incarcerated felons to receive "old-age" social security benefits was not punishment); *see also Hawker v. New York,* 170 U.S. 189, 18 S.Ct. 573, 42 L.Ed. 1002 (1898) (revoking medical license is not punishment).

In *California Dep't of Corrections v. Morales,* —— U.S. ——, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995), the Supreme Court rejected an ex post facto challenge to a statute that essentially reduced the entitlement of certain convicted felons (those convicted of more than one offense involving the taking of a life) to a parole eligibility hearing from once a year to once every three years. —— U.S. at ——, 115 S.Ct. at 1605. In doing so, however, the Court reiterated the proposition that the Ex Post Facto Clause " 'forbids the application of any new punitive measure to a crime already consummated.' " —— U.S. at ——, 115 S.Ct. at 1601 (*quoting Lindsey v. Washington,* 301 U.S. 397, 401, 57 S.Ct. 797, 799, 81 L.Ed. 1182 (1937)). The Court also made it clear that "the question of what legislative adjustments 'will be held to be of sufficient moment to transgress the constitutional prohibition' *must* be a matter of 'degree.' " —— U.S. at ——, 115 S.Ct. at 1603 (*quoting Beazell v. Ohio,* 269 U.S. 167, 171, 46 S.Ct. 68, 69, 70 L.Ed. 216 (1925)). Hence, the Court in *Morales* certainly contemplated that a court should look at the effects of a law in determining whether it amounted to punishment. *See Artway,* 81 F.3d at 1260 ("*Morales* makes clear that a law can consti-

tute unconstitutional 'punishment' because of its effects.").

One final Supreme Court case that warrants discussion is *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963). The issue presented was whether statutes divesting Americans of their United States citizenship were "essentially penal in character" so as to require that the respondents in such proceedings be provided the procedural rights guaranteed by the Fifth and Sixth Amendments, including the rights to due process, trial by jury, confrontation of witnesses, and assistance of counsel. 372 U.S. at 164, 83 S.Ct. at 565. The Court held that the sanction of divestiture of citizenship was punitive in nature. In reaching that conclusion, the Court considered what it described as "the tests traditionally applied to determine whether an Act of Congress is penal or regulatory in character":

> [w]hether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as punishment, whether it comes into play only on a finding of scienter, whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned. . . .

*Id.* at 168–69, 83 S.Ct. at 567–68 (footnotes omitted).

The cases that have considered the constitutionality of sex offender statutes have struggled with the issues of whether the "*Mendoza–Martinez* factors" should be applied and, if so, how to apply them.[13] The Supreme Court suggested in a footnote in

13. *See, e.g., Artway v. Attorney General,* 81 F.3d at 1262–63 (*Mendoza–Martinez* factors are "too indeterminate and unwieldy to provide much assistance"); *Roe v. Office of Adult Probation,* 938 F.Supp. at 1089–91 (the *Mendoza–Martinez* analysis is "primarily" the framework that should guide the court's inquiry); *W.P. v. Poritz,* 931 F.Supp. at 1209 (applying analysis "similar" to that in *Kennedy v. Mendoza–Martinez,* although factors considered "are not identical"); *Stearns,*

slip op. at 6 (applying *Mendoza–Martinez* factors); *Nitz,* slip op. at 11, 17 (though noting that "the *Mendoza–Martinez* factors are, as a matter of logic, clearly relevant to deciding whether punishment is present," court held that it was "now disabused of the notion that consideration of the *Mendoza–Martinez* factors provides a guide"); *Rowe,* 884 F.Supp. at 1378–80 (applying *Mendoza–Martinez* factors); *Artway v. Attor-*

*Austin* that courts should not apply the *Mendoza–Martinez* factors in determining whether a statute violates the Ex Post Facto Clause. 509 U.S. at 610 n. 6, 113 S.Ct. at 2806 n. 6. Some of the *Mendoza–Martinez* factors, however, plainly aid in the overall inquiry. Moreover, the Supreme Court itself has relied on some of these factors in reaching its decisions in *Ursery, Kurth Ranch, Austin,* and *Halper.*[14]

### 4. *An Analytical Approach*

 As the foregoing review of the case law demonstrates, the Supreme Court has not established, nor have the lower courts reached consensus on, a definitive "test" for determining whether government action constitutes punishment for purposes of the Ex Post Facto Clause. Nor do the parties in the instant case agree on the appropriate test to apply. Relying on *Ursery,* defendants advocate a two-step approach that examines "(1) whether a measure was intended to remedy a present situation rather than to punish past conduct and, (2) if so, whether the measure's overall design bears out that remedial purpose." (Def.Mem. at 12). Not surprisingly, plaintiffs prefer the historical and functional approach that I took in granting the preliminary injunction in this case with respect to the notification provisions. *See* 919 F.Supp. at 699–700. (Pl.Mem. at 19–20; Pl.Reply Mem. at 5).

Defendants' approach must be rejected, for it would eliminate consideration of the "effects" of the Act as well as the historical treatment of registration and notification. Virtually all the relevant cases—including *Ursery* and *W.P. v. Poritz,* upon which defendants so heavily rely—consider the "effects" of a law as well as the historical factors. *See also Morales,* —— U.S. at ——, 115 S.Ct. at

1603. Unfortunately, there is no "magic formula" that one can apply to determine whether government action is "punitive." Rather, one must look at the totality of the circumstances, keeping in mind the definition and purposes of punishment and the purposes of the Ex Post Facto Clause, to determine whether a government measure constitutes punishment.

 In looking at the totality of circumstances, the most logical approach, and the approach most consistent with the Supreme Court case law on whether government action is "punishment," is to analyze the circumstances—including some of the circumstances considered by the Court in *Mendoza–Martinez*—by grouping them in the four areas that have been the subject of discussion in the other Megan's Law decisions reviewed above: (1) intent, (2) design, (3) history, and (4) effects. (*See supra* pp. 615–17). Before I review the Act in the context of these four areas, I must note my agreement with Judge Bissell that, regardless of the factors a court considers, the court cannot transform them into a "rigid series of hurdles" that "must be surmounted, one after the other." *W.P. v. Poritz,* 931 F.Supp. at 1209. Rather, the factors must be considered in a "less structured fashion," *id.,* and the question of what "legislative adjustments" will be of " 'sufficient moment' " to constitute punishment "*must* be a matter of 'degree.' " *Morales,* —— U.S. at ——, 115 S.Ct. at 1603 (*citing Beazell v. State of Ohio,* 269 U.S. 167, 171, 46 S.Ct. 68, 69, 70 L.Ed. 216 (1925)); *see also Artway,* 81 F.3d at 1263 (the determination is "necessarily one of degree"). Finally, the "clearest proof" is required to show that a statute that was intended to provide a civil remedy has been transformed by its "form and ef-

---

*ney General,* 876 F.Supp. at 688–92 (applying *Mendoza–Martinez* factors).

**14.** Indeed, although the Supreme Court in *Ursery* does not cite *Kennedy v. Mendoza–Martinez,* the Court does consider some of the same factors in addressing the issue of whether civil forfeiture was punishment. —— U.S. at —— – ——, —— – ——, 116 S.Ct. at 2140–42, 2148–49 (considering historical treatment of civil forfeiture, whether civil forfeiture is "so punitive in form and effect" as to be criminal, whether scienter is required, whether civil forfeiture serves purpose of deter-

rence, whether civil forfeiture is tied to criminal activity). *See also Kurth Ranch,* 511 U.S. at ——, 114 S.Ct. at 1946 (analyzing whether tax serves goals of punishment, whether tax was conditioned on commission of a crime, and whether behavior to which tax applies is already a crime); *Austin,* 509 U.S. at 610–15, 113 S.Ct. at 2805–08 (analyzing whether forfeiture was historically regarded as punishment); *Halper,* 490 U.S. at 448–49, 109 S.Ct. at 1901–02 (analyzing whether fine was punishment because it was excessive in relation to regulatory purpose asserted by the government).

fect" into a punitive measure. *Ursery,* —— U.S. at ——, 116 S.Ct. at 2148 (*quoting United States v. One Assortment of 89 Firearms,* 465 U.S. 354, 365, 104 S.Ct. 1099, 1106–07, 79 L.Ed.2d 361 (1984) (*quoting United States v. Ward,* 448 U.S. 242, 249, 100 S.Ct. 2636, 2641–42, 65 L.Ed.2d 742 (1980))).

■ I will consider the registration and notification provisions separately. Since notification is more troublesome and requires greater discussion, I will address it first.

### a. *Notification*

#### (1) *Intent*

■ The starting point is the legislature's intent in passing the law in question. *See Ursery,* —— U.S. at —— – ——, 116 S.Ct. at 2146–47; *United States v. Ward,* 448 U.S. at 248–49, 100 S.Ct. at 2641–42. The intent must be examined both subjectively, *i.e.,* the stated intent of the legislature, as well as objectively, *i.e.,* whether, even assuming the stated intent is not to punish, any "punitive goals [are] necessarily implicated" or whether the law has "mixed objectives." *W.P. v. Poritz,* 931 F.Supp. at 1213; *see Kurth Ranch,* 511 U.S. at ——, 114 S.Ct. at 1945 ("the legislature's description of a statute as civil does not foreclose the possibility that it has a punitive character"); *Collins,* 497 U.S. at 46, 110 S.Ct. at 2721 ("simply by labeling a law [regulatory], a legislature does not thereby immunize it from scrutiny under the Ex Post Facto Clause"); *see also Ursery,* —— U.S. at ——, 116 S.Ct. at 2147; *Roe v. Office of Adult Probation,* 938 F.Supp. at 1088–89.

Here, the legislature's subjective intent, as described in the preamble to the Act, is regulatory. The preamble expresses the legislature's belief that, because of the "danger of recidivism posed by sex offenders," the public is in need of protection. The preamble further expresses the view that registration and the sharing of information with the public would assist in the investigation, apprehension, and prosecution of sex offenders. Hence, the preamble shows that, subjectively, the legislature intended the Act to be regulatory.

The inquiry into legislative intent, however, does not end with the preamble. While I have no doubt that the legislature actually intended to assist law enforcement and to protect the citizens of the state by passing notification provisions of the Act, there are strong indications that, both subjectively and objectively, the legislature also intended to punish sex offenders.

The debate minutes of the New York Assembly are most revealing. They vividly show the passion, anger, and desire to punish that members of the legislature felt toward sex offenders.

One member of the Assembly observed:

I don't know if, when [a sex offender is] released from prison, he will come back, but the statistics ... have shown that *once a pedophile, always a pedophile.*

(Assembly Minutes at 383) (statement of Assemblyman Herbst) (emphasis added).

Another commented:

We are talking about innocent children here, children who are exploited by the *lowest of the low.* No one is lower than a person who will exploit a child.... [W]e are telling those who act like that, who are like that, that *we in New York have had it. We are coming out to get them and it's going to stop.*

 · · · · ·

Today, vote for this bill, *take a chance regardless of what it may be, the Constitution,* the apprehension. *Don't give the protection to the animals,* don't give it to the people exploiting children, protect the children.

(Assembly Minutes at 360–61) (statement of Assemblyman Healey) (emphasis added).

Another stated:

[T]he result of this [legislation] ... is the fact that a sex offender who is going to come out after serving his time might rethink as to where he is going to relocate, and I think that *one of the results of this legislation might be that this guy is going to go out of town, out of state, and that's very good for us.*

(Assembly Minutes at 388–89) (statement of Assemblyman Weisenberg) (emphasis added).

Another observed:

I have listened to some of my colleagues talk about the constitutionality of the retroactive provisions. I have listened to people say, "Well, these people are wrongly criticized, will they be wrongfully abused in their neighborhoods?" *You know what? I don't care.*

(Assembly Minutes at 389–90) (statement of Assemblywoman Wirth) (emphasis added).

Yet another commented:

You know, we are talking about fairness for people who committed the ultimate crime of molestation, of rape, of a three-year-old girl, of a nine-year-old boy. We, as a society, dictate what's fair and what's right and what is just through our laws and our rules. That's what makes us all up; that's what makes government so we can dictate what's right and what's fair. And I will tell you personally, *I think these people have no rights . . . .*

(Assembly Minutes at 392–93) (statement of Assemblyman Manning) (emphasis added).

Yet another:

The usual defenders of the *depraved,* once again, we are worried about the constitutional rights of the criminals. Finally a bill addresses the right of society.

(Assembly Minutes at 393) (statement of Assemblyman Kirwan) (emphasis added).

And finally:

[R]epeat sexual predators, especially those that prey on children, are *the human equivalent of toxic waste . . . .*

(Assembly Minutes at 417) (statement of Assemblyman Tedisco) (emphasis added).[15]

Clearly, at least certain members of the legislature felt that sex offenders were "depraved," "the lowest of the low," "animals," and "human equivalent of toxic waste" who, because of what they had done, because of their crimes, deserved whatever they got. Even in their motion papers now, defendants argue that "[a]ny hardships encountered by plaintiffs are caused by their own actions and are not the fault of the state." (Def.Mem. at 29). This thinking unequivocally exposes the punitive side of the Act.

Likewise, the debate minutes demonstrate clearly that the legislature was making broad generalizations and assumptions about individuals convicted of sex offenses. This fact also is indicative of a punitive intent. As the Supreme Court recently noted,

retroactive statutes raise particular concerns. The Legislature's unmatched powers allow it to sweep away settled expectations suddenly and *without individualized consideration.* Its responsivity to political pressure poses a risk that it may be tempted to use retroactive legislation as a means of retribution against unpopular groups or individuals . . . .

*Landgraf,* 511 U.S. at ——, 114 S.Ct. at 1497 (emphasis added).

Even assuming that the legislature's only purpose in passing the Act was to protect children and other victims of sex offenses—and it is difficult, if not impossible, to draw that conclusion in view of the debate minutes—the effects of the Act cannot be ignored. Otherwise, virtually any punishment could be justified. *See Nitz,* slip op. at 12 (rejecting "the proposition that the Ex Post Facto Clause establishes no limits on legisla-

---

**15.** It is plain that members of the Assembly had serious questions about the constitutionality of certain provisions of the Act, but were willing to "take a chance regardless of what it may be, the Constitution," because of their view that sex offenders did not deserve protection. (Assembly Minutes at 360–61). As a member of the Assembly who voted against the bill observed:

I also think that there is some belief that there are unconstitutional provisions in this law and that ultimately the law will be kicked back with some clarifications from the court so that we may be able to do something that's

more effective and stands up under constitutional scrutiny.

(Assembly Minutes at 358) (statement of Assemblywoman Glick).

In addition, one of the sponsors of the bill essentially acknowledged that the Act was punitive to a degree by describing the effort made to "assure" that the Act would be considered "more regulatory than punitive." Assembly Minutes, at 385 (statement of Assemblyman Feldman). That statement, of course, implies that there is some measure of punishment involved.

tive enactments, regardless of the severity of punishment they inflict, so long as the punishment is necessary or narrowly tailored to achieve a legitimate regulatory objective").

Indeed, states have sought to implement measures that are manifestly punitive in an effort to protect victims of sexual abuse. The State of Washington enacted a law that provided for the involuntary "civil commitment" of sex offenders—*after* they completed their prison sentences—to protect victims of sex crimes. Not surprisingly, this law was struck down on ex post facto and other grounds. *See Young v. Weston,* 898 F.Supp. 744 (W.D.Wash.1995). The State of California has recently passed a bill that would provide for involuntary "chemical castration"—regular injections of a sex-drive reducing drug—for convicted sex offenders released on parole who refused to voluntarily submit to surgical castration. Even if these civil commitment and chemical castration schemes were motivated solely by a desire to protect, there is little doubt that they would still be punitive.

The fact that legislative bodies are resorting to these types of measures and the emotion and passion reflected by the debate minutes of the New York State Assembly confirm the appropriateness of subjecting sex offender laws to the scrutiny required by the Ex Post Facto Clause. Stirred on by the "sudden and strong passions" that result from acts of violence against children, legislatures are subjecting sex offenders as a group to the harshest of measures. It is precisely this kind of emotional reaction from our lawmakers that the Ex Post Facto Clause was intended to temper. *Fletcher v. Peck,* 10 U.S. (6 Cranch) 87, 137–38, 3 L.Ed. 162 (1810).

We must remember that the Ex Post Facto Clause was intended to protect all society and not just individuals subjected to punishment after the fact. Indeed, if we permit the erosion of constitutional rights even for those who are not deserving of protection—those who may be viewed as the current epitome of evil—all society will suffer in the long run.

### (2) *Design*

The Act is designed in such a fashion as to suggest that it is punitive. It contains classic indicia of a punitive scheme. Its provisions are triggered by behavior that is "already a crime." Scienter is also a consideration. *Kennedy v. Mendoza–Martinez,* 372 U.S. at 168–69, 83 S.Ct. at 567–68. Moreover, the Act provides for the sentencing judge to determine the level of notification. § 168–n. It also provides for consideration of victim impact statements in determining the public notification level. § 168–*l* (5)(i). Many of the risk factors used to determine the notification level relate to the crime or its circumstances or to the offender's criminal history. § 168–*l* (5)(a), (b). For example, someone who commits one of the designated "sexually violent offenses" may be required to register once every 90 days for at least ten years and potentially for life. §§ 168–a(7), 168–f(3), 168–h, 168–*l* (6)(c). Finally, the failure to register subjects the individual to criminal prosecution or the revocation of parole. § 168–t.

Defendants argue that the Act is not punitive because it has been narrowly designed to avoid the abuse of information released about sex offenders. *See W.P. v. Poritz,* 931 F.Supp. at 1212–13; *Stearns v. Gregoire,* slip op. at 9; *Doe v. Poritz,* 662 A.2d at 422. The legislature has clearly made an effort to control access to and use of information about registrants. For example, access to the subdirectory will not be given without a written request. §§ 168–*l* (6)(c), 168–q. Callers to the 900 number will not be able to obtain information unless they identify themselves and provide some information identifying the registrant about whom they are calling. Moreover, the telephone calls will be recorded. § 168–p. Finally, the unauthorized release of any information is a crime. § 168–u. Despite these efforts, as discussed below, information has been abused.

In fact, the Act is not narrowly designed, but is excessive in such a way as to suggest that it is punitive. First, it is excessive in its sweep. It covers a broad group of individuals, including first time offenders as well as individuals who do not even engage in sexual conduct. It covers 36 offenses, including seven misdemeanors. It covers a 21–year old who engages in sexual intercourse with a 16–year old (who is not a spouse). *See* § 168–

a(2)(a) (*citing* N.Y.Penal Law § 130.25 (McKinney 1987)). It covers someone who engages in "incest." § 168–a(2)(a) (*citing* N.Y.Penal Law § 255.25 (McKinney 1989)). It covers someone who "restrains another person," as long as the victim is under 17, even if no sexual conduct is involved. § 168–a(2)(a) (*citing* N.Y.Penal Law § 135.05 (McKinney 1987)). While all three of these situations certainly involve criminal conduct, these are hardly compelling circumstances for the application of the Act. It is not at all clear how their inclusion furthers the purposes of the Act.

Second, the Act permits some public disclosure for all registrants, including those at the lowest risk level ("the risk of repeat offense is low"). § 168–*l* (6)(a). Information about all registrants is made publicly available through the 900 telephone number. (Stip. ¶ 23). In contrast, California, which apparently is the only other state with a 900 number for information about sex offenders, only provides information about individuals convicted of sex offenses against children. (O'Connell Decl. ¶¶ 3–4). Likewise, other states do not permit any form of community notification unless there is "some evidence that the offender poses a threat to the public" or there is some evidence of "dangerousness in the future." *State of Washington v. Ward*, 869 P.2d at 1070; *accord W.P. v. Poritz*, 931 F.Supp. at 1204 (only disclosure to law enforcement permitted with respect to Tier I registrants (low risk of reoffense)). Significantly, the vast majority of the registrants under the Act have been classified at the two higher risk levels and hence are subject to additional public notification. (Stip. Concerning Classification, ¶¶ 2, 5, 6, 12, 17). The fact that public disclosure is permitted even with respect to low risk individuals suggests a punitive design.

Third, the Act permits broad and virtually uncontrolled disclosure. Law enforcement authorities may disseminate "relevant information" to "any entity with vulnerable populations." § 168–*l* (6)(b), (c). Such entities are then explicitly permitted to disclose fur-ther disseminate the information "at their discretion." *Id.*

In short, although the New York legislature did take certain precautions to limit the circumstances of notification, the Act is designed in such a fashion as to suggest that it is punitive in nature.

### (3) *History*

One important area of consideration is whether measures similar to community notification have historically been considered punitive. There are two types of analogous measures that suggest that community notification is punitive: stigmatization and banishment.

### (i) *Stigmatization*

Branding and badges of shame have been used as forms of punishment since colonial times. *See generally Ex Parte Wilson*, 114 U.S. 417, 428, 5 S.Ct. 935, 940, 29 L.Ed. 89 (1885) ("In former times, being put in the stocks was not considered as necessarily infamous."); *see also Artway v. Attorney General*, 876 F.Supp. at 688 n. 14.[16] These methods of punishment employed societal pressure to enforce the prevailing moral order. Colonial lawmakers hoped that the offender would feel "on his back the invisible whip of public opinion" to deter him from future wrongdoing. Lawrence M. Friedman & Harry N. Scheiber, *American Law and the Constitutional Order* 14 (1988).

There are numerous cases of branding and shaming in colonial America. For example, under a 1648 Massachusetts statute, a burglar was to be "branded on the forehead with the letter (B)." Friedman & Scheiber, *supra*, at 13. A 1701 New Hampshire adultery statute decreed that a "man and woman convicted of adultery were to be 'Sett upon the Gallows' for an hour 'with a Rope about their necks and the other [end] . . . cast over the Gallows'; afterwards they were to be 'severely whipt.' Moreover, the offenders would 'for ever after weare a Capitall Letter :A: of two inches long and proportionable in Bignesse, cutt out in Cloath of a contrary Colour to their Cloaths and Sewed upon their Upper

---

16. William Blackstone wrote of the use of "fix[ing] a lasting stigma on the offender, by slitting the nostrils, or branding in the hand or cheek." 11 William Holdsworth, *A History of English Law* 556 (1938).

Garments, on the out Side of their Arme or on their Back in open View.'" Lawrence M. Friedman, *Crime and Punishment in American History* 40 (1993) (citations omitted).

These types of punishments, including stocks and pillories, punished criminals by subjecting the offenders to public shame. As one commentator wrote, "When the pillory was employed in a simple fashion and not accompanied by any other mode of punishment, its operation was chiefly psychological, and it was designed to bring about the feeling of humiliation naturally attendant upon the infliction of public disgrace." Harry E. Barnes, *The Story of Punishment: A Record of Man's Inhumanity to Man* 62–63 (1930), *quoted in* Jon A. Brilliant, *The Modern Day Scarlet Letter: A Critical Analysis of Modern Probation Conditions*, 1989 Duke L.J. 1357, 1361 n. 27 (1989).

Branding was used not only to inflict immediate punishment upon criminals but also to subject them to ongoing public animus based on the premise that these offenders were incorrigible. As Professor Friedman notes, "The message was that *this* offender was not likely to mend his ways; disgrace would and should last until death.... [B]randing and mutilation labeled a man or woman a deep-dyed sinner." Friedman, *Crime and Punishment*, at 40. Thus, using the power of public humiliation alone as a form of punishment has a long history in America. *See People v. Letterlough*, 86 N.Y.2d 259, 631 N.Y.S.2d 105, 108, 655 N.E.2d 146, 149 (1995) (in holding that sentencing court was not authorized to impose condition of probation requiring defendant to affix to license plate of any vehicle he drove a sign stating "convicted dwi," court ruled that "public disclosure of a person's crime, and the attendant humiliation and public disgrace, has historically been regarded strictly as a form of punishment"); *Artway v. Attorney General*, 876 F.Supp. at 689 (punitive

nature of public notification of one's crime dates back to biblical times, as illustrated by the phrase "the Mark of Cain").

Public notification is the modern-day equivalent of branding and shaming. Instead of using a brand or other physical mutilation, the Act employs a 900 telephone service, a subdirectory, and photocopiers. *See W.P. v. Poritz*, 931 F.Supp. at 1216 ("Megan's Law informs those likely to encounter the offender, assisted by the technological advances of photography and xerographic reproduction."). Instead of affixing a "scarlet letter" on a sex offender's chest, a superintendent of schools, for example, will engage in a mass mailing to notify all the residents of the community that an individual has moved into the neighborhood who not only is a convicted sex offender but may be a threat to children. (*See* Hendricks Reply Aff., dated March 15, 1996, Exhs. A, B). Like the branding and public shaming statutes, community notification laws punish by inflicting shame and public disgrace on the offender. Indeed, as the debate minutes show, today's lawmakers—like their colonial counterparts—are counting on "the invisible whip of public opinion" to deter the sex offender from future wrongdoing.[17] Moreover, just as the message of branding was that "*this* offender was not likely to mend his ways," the premise underlying the Act is the belief that once someone is a sex offender, he or she will always be a sex offender. (*See* Assembly Minutes at 383 ("once a pedophile, always a pedophile"), 380 ("these people, you can't rehabilitate, rehabilitation doesn't work")).

The United States argues in its *amicus* brief that the shaming statutes are not an appropriate analogy because the purpose of the Act is not to humiliate or draw public ridicule but to protect. (U.S.Mem. at 15). This argument is rejected. First, the debate minutes quoted above show that a "lust for retribution" may very well have been a factor

---

17. Shaming statutes fell out of favor in the nineteenth century as incarceration became the punishment of choice. Friedman & Scheiber, *American Law*, at 17. One reason for this shift away from shaming was that people came to believe that shaming was simply not effective as society grew larger and more heterogenous. Societal pressure was far less effective in keeping offend-ers in line when there was no longer a common belief system and a tightly knit society to enforce it. Friedman, *Crime and Punishment*, at 77. Another reason shaming statutes became less popular was a growing belief that this form of punishment was "uncivilized," particularly as society began to focus more on rehabilitation. *Id.* at 75.

in the passage of the Act. Second, even assuming that the New York legislature's purpose was purely protective, legislative purpose cannot be the sole consideration. Indeed, if legislative purpose were to control the outcome, there would be no point in considering any factor other than legislative intent. Yet, common sense dictates, and the cases clearly hold, that other factors must be considered as well.

The United States urges that the notification provisions of the Act are comparable to "traditional 'wanted' posters for outlaws" and "television and radio announcements warning of criminal fugitives." (U.S.Mem. at 17 (citing W.P. v. Poritz, 931 F.Supp. at 1217)). The analogy does not work. There is a vast difference between an outlaw or fugitive who is seeking to escape capture and prosecution and an individual who has been convicted and has already paid his debt to society. The government's interest in apprehending fugitives who present a threat to the public because they seek to escape punishment for their crimes is far different from its interest in notifying the public about a sex offender who has completed a term of imprisonment. Indeed, if anything, the use of the analogy to outlaws and fugitives who have yet to be punished is further indication of the existence of a punitive edge to the Act.

### (ii) *Banishment*

Banishment or exclusion from the community has been considered punishment since before the time of the Revolution. Indeed, "[b]anishment was a weapon in the English arsenal for centuries," *Kennedy v. Mendoza–Martinez*, 372 U.S. at 168–70 n. 23, 83 S.Ct. at 567–68 n. 23, and the English used banishment to the American colonies as a form of punishment. *Schick v. Reed*, 419 U.S. 256, 261, 95 S.Ct. 379, 382–83, 42 L.Ed.2d 430 (1974) ("our own Colonies were the recipients of numerous subjects of 'banishment'"); *see also* Friedman, *Crime and Punishment*, at 40.

Banishment was the next step after branding: criminals who were deemed a "permanent danger" or who engaged in repeated criminality were excluded from the community all together. Friedman, *Crime and Punishment*, at 40. Banishment was not often imposed, however, because "it was always 'adjudged a harsh punishment even by men accustomed to brutality in the administration of justice.'" *Kennedy v. Mendoza–Martinez*, 372 U.S. at 168–70 n. 23, 83 S.Ct. at 567–68 n. 23 (quoting Maxey, *Loss of Nationality: Individual Choice or Government Fiat?*, 26 Albany L.Rev. 151, 164 (1962)); *see also* Friedman, *Crime and Punishment*, at 41.

Banishment from the community was not limited to physical banishment. Branding and other permanent forms of stigmatization effectively banished offenders from the community by subjecting them to ostracism. Massaro, *supra*, at 1913. After having suffered public humiliation, offenders were often unable to return to their place in society. Brilliant, *The Modern Day Scarlet Letter: A Critical Analysis of Modern Probation Conditions*, 1989 Duke L.J. at 1361–62.

Notification statutes have resulted in the banishment of sex offenders both literally and psychologically. Not only have sex offenders literally been forced to relocate to different towns and even different states, public notification has made it difficult if not impossible for them to reintegrate into society. Moreover, banishment is precisely what some members of the New York State Assembly intended, as one Assemblyman publicly expressed the hope that the Act would drive sex offenders "out of town, out of state." (Assembly Minutes at 388–89) (statement of Assemblyman Weisenberg).

Hence, a comparison with historical analogues suggests that notification is punitive.

### (4) *Effects*

■ Perhaps more clearly than anything else, the effects of community notification show that these provisions are punitive. Notification increases punishment simply because it increases the penalty—or suffering in right, person, or property—imposed on a sex offender for his crime. A discussion of "effects" requires consideration of: (i) whether the Act imposes an affirmative disability or restraint on registrants, (ii) whether the Act increases punishment by interfering with the ability of sex offenders to rehabilitate,

and (iii) whether the Act serves the goals of punishment.

### (i) *Disability or Restraint*

Public notification has led to an "affirmative disability or restraint" on registrants and their families and, indeed, to excessively harsh results. These include not just a few highly-publicized incidents, but the repeated incidents reviewed above. (*See supra* pp. 608–11). As I noted in my prior opinion issuing a preliminary injunction, one could argue, depending on the crime involved, that these sex offenders deserved this treatment. 919 F.Supp. at 701. The question before the Court, however, is not whether they did, but whether the effect of public notification is to punish. Clearly, it is.

Defendants contend that an otherwise regulatory law is not rendered punitive merely because it imposes "unpleasant consequences." (Def.Mem. at 20). I agree. As the Supreme Court made clear in *Ursery*, the mere fact that legislation imposes some deterrent effect on individuals does not automatically transform it from a regulatory measure into a punitive measure. — U.S. at —, 116 S.Ct. at 2149. Yet the converse must also be true. A punitive legislative scheme may also have some regulatory aspects to it. Punishment is not merely retribution or retaliation; it may also have as goals incapacitation (or protection), deterrence, and rehabilitation. The fact that the Act may be regulatory in some respects does not preclude a finding that it increases punishment for purposes of the Ex Post Facto Clause.

Defendants rely heavily on the cases upholding other statutes that imposed restrictions on convicted felons after the fact, such as *De Veau*. *See also Bae v. Shalala*, 44 F.3d 489, 493–94 (7th Cir.1995); *United States v. Huss*, 7 F.3d 1444, 1447–48 (9th Cir.1993); *Wiley v. Bowen*, 824 F.2d 1120, 1122 (D.C.Cir.1987). These cases do not require the conclusion that the public notification provisions of the Act are regulatory. Public notification under the Act is not simply a matter, for example, of being qualified to work in the pharmaceutical industry or on the waterfront or being qualified to carry a gun. Rather, public notification results in broader, more fundamental consequences—which amount to punishment. As Judge Squatrito noted in *Roe v. Office of Adult Probation*, 938 F.Supp. at 1091, "the consequences of [community notification] are unlimited. Notification is an affirmative placement by the State of a form of public stigma on [the sex offender], and this stigma by its very nature pervades into every aspect of an offender's life."

Finally, defendants contend that the state cannot be blamed for the harm that has arisen from the "private reactions" of members of the general public. (Def.Mem. at 32). *See, e.g., W.P. v. Poritz*, 931 F.Supp. at 1211–12; *Doe v. Poritz*, 662 A.2d at 376. Likewise, they contend that all the information in question is already public information available through other means. *See, e.g., Stearns*, slip op. at 9–10; *People v. Afrika*, 648 N.Y.S.2d at 240. These arguments ignore the fact that the Act gathers this information and makes it much more accessible to the public. Public access to criminal records that are theoretically on file somewhere in a courthouse or other government building is a far cry from the public access made possible by the Act. In another context the Supreme Court noted:

> Plainly there is a vast difference between the public records that might be found after a diligent search of courthouse files, county archives, and local police stations throughout the country and a computerized summary located in a single clearing-house of information.

*United States Dep't of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749, 764, 109 S.Ct. 1468, 1477, 103 L.Ed.2d 774 (1989) (in Freedom of Information Act case, holding that the FBI was not required to disclose contents of rap sheets, even though much of the information was public information); *see also Whalen v. Roe*, 429 U.S. 589, 605–06, 97 S.Ct. 869, 879–80, 51 L.Ed.2d 64 (1977) ("We are not unaware of the threat to privacy implicit in the accumulation of vast amounts of personal information in computerized data banks or other massive government files."); *id.* at 607, 97 S.Ct. at 880–81 ("The central storage and

easy accessibility of computerized data vastly increase the potential for abuse of that information. . . .") (Brennan, J., concurring). The accessibility of data provided by the Act is clearly in itself a cognizable source of its punitive effects.

### (ii) *The Effect on Rehabilitation*

The effect of public notification on the ability of sex offenders to rehabilitate strongly suggests that the Act is punitive. Sex offenders are given a sentence, serve it, and then are expected to re-enter society, hopefully having been rehabilitated by their punishment of incarceration. Public notification, however, prevents sex offenders from finding a home, getting a job, and reintegrating into society. As the Oregon Report notes, relatives, halfway houses, and community transition programs have become "more reluctant" to take in sex offenders because of community notification. (Oregon Report, pp. 13–14). Thus, sex offenders have been forced to move from one temporary residence to another. Similarly, employers have been more reluctant to hire released sex offenders because of community notification. (*Id.*).

By impeding rehabilitation, public notification "substantially interfere[s] with the objectives of the original punishment, including the eventual rehabilitation of the offender." *Nitz*, slip op. at 13. As the court commented in *Nitz*:

If the law says that the maximum punishment for a crime is ten years of incarceration, eleven years of incarceration cannot be imposed. When a court sentences a defendant to a term of incarceration, the sentence reflects a determination that at the end of that term of incarceration (and any attendant period of supervised release or the like), the defendant will be considered to have paid for his crime and be entitled, indeed expected, to go about completing his rehabilitation by reintegrating with society.

*Id.* at 13. Likewise, Justice Brennan recognized the tension between retribution and rehabilitation when he wrote, in the context of using denationalization as punishment,

I can think of no more certain way in which to make a man in whom, perhaps, rest the seeds of serious antisocial behavior more likely to pursue further a career of unlawful activity than to place on him the stigma of the derelict, uncertain of many of his basic rights.

*Trop v. Dulles*, 356 U.S. 86, 111, 78 S.Ct. 590, 604, 2 L.Ed.2d 630 (1958) (Black, J., concurring).[18]

The court in *Nitz* held that because the public notification provisions of the Alaska law impeded the sex offender's ability to rehabilitate and reintegrate into society, they increased punishment and thus ran "afoul" of the Ex Post Facto Clause. *Nitz*, slip op. at 14.[19] This reasoning applies with equal force to this case. Because they substantially impede the ability of sex offenders to rehabilitate, the notification provisions of the Act increase punishment.

### (iii) *The Goals of Punishment*

Another important issue is whether the Act has the effect of serving the traditional goals of punishment. *Kennedy v. Mendoza–Martinez*, 372 U.S. at 168–69, 83 S.Ct. at 567–68 ("whether [a sanction's] operation will

---

18. *See also Weems v. United States*, where the Supreme Court held that a sentence of long-term government surveillance after completion of a 12–year prison sentence constituted cruel and unusual punishment. The Court wrote:

[Defendant's] prison bars and chains are removed, it is true, after twelve years, but he goes from them to a perpetual limitation of his liberty. He is forever kept under the shadow of his crime, forever kept within voice and view of the criminal magistrate, not being able to change his domicile without giving notice to the "authority immediately in charge of his surveillance" and without permission in writing. He may not seek, even in other scenes and among other people, to retrieve his fall from rectitude. Even that hope is taken from him, and he is subject to tormenting regulations that, if not so tangible as iron bars and stone walls, oppress as much by their continuity, and deprive of essential liberty.

217 U.S. 349, 366, 30 S.Ct. 544, 549, 54 L.Ed. 793 (1910).

19. Nonetheless, the court denied a preliminary injunction on the basis of a balancing of the hardships tipped in favor of the public's need for protection. *Id.* Here, the issues are before the Court not on a motion for a preliminary injunction, but on cross-motions for summary judgment.

promote the traditional aims of punishment—retribution and deterrence"). The notification provisions of the Act have the effect of promoting three of the traditional goals of punishment: deterrence, retribution, and incapacitation.

"[P]unishments aim to deter future undesired conduct by visiting some significantly unpleasant consequence upon the criminal." *Rowe*, 884 F.Supp. at 1379. The ostracism, public humiliation, and other harsh consequences that result from public notification certainly deter future criminal conduct. Moreover, public notification also serves the goal of retribution by giving the sex offenders what many believe they deserve. Finally, public notification has the effect of incapacitating sex offenders as it restricts their ability to reenter society and indeed results in their banishment from the community.

In sum, the legislative intent, the design of the Act, the historical treatment of comparable measures, and the Act's effects provide the "clearest proof" that the notification provisions of the Act are punitive in nature. Because of the current climate of fear and anger, because convicted sex offenders as a group have been deemed undeserving of any rights, the New York legislature has passed a law that increases punishment after the fact and that "sweep[s] away settled expectations suddenly and without individualized consideration." *Landgraf*, 511 U.S. at ——, 114 S.Ct. at 1497. Accordingly, I hold that the public notification provisions of the Act, including the 900 number and all forms of public dissemination of information, constitute punitive, not regulatory, measures. Application of these measures to individuals who committed their crimes before the Act was passed violates the Ex Post Facto Clause.

**b. *Registration***

 Virtually every court that has considered the issue of whether registration is punishment for purposes of the Ex Post Facto Clause has held that it is not. *See, e.g., Artway v. Attorney General of New Jersey,* 81 F.3d at 1253–67; *Rowe v. Burton,* 884 F.Supp. at 1377–80; *Doe v. Poritz,* 662 A.2d at 387–406; *State v. Ward,* 869 P.2d at 1069;

*State v. Noble,* 829 P.2d at 1221–25; *but see Louisiana v. Payne,* 633 So.2d 701 (La.Ct. App.1993). Nonetheless, plaintiffs contend that the registration provisions of the Act are punitive. While I agree that there are some punitive aspects to registration, ultimately I conclude that registration is regulatory and not punitive. Hence, the Ex Post Facto Clause does not bar retroactive application of the registration provisions of the Act. I review registration in the context of the four areas discussed above: (1) intent, (2) design, (3) history, and (4) effects.

### (1) *Intent*

As noted, the New York State legislature's stated intent in passing the Act was to protect. Although I have concluded that there was a punitive purpose to the Act in the context of community notification, I do not draw that conclusion with respect to registration.

Registration plainly serves the valid regulatory goals of the Act to protect the public and aid law enforcement. Indeed, registration is a legitimate and necessary means toward achieving those goals. By knowing where convicted sex offenders reside, by knowing when they move into a new neighborhood, law enforcement authorities will be in a better position to protect their communities and to enforce the laws. Ultimately, the crucial question is whether registration imposes requirements or leads to results that are so excessive that the punitive aspects overcome the regulatory purposes. In my view, they do not.

### (2) *Design*

As noted above in the discussion of public notification, the Act contains features that are classic indicia of a punitive scheme. (*See supra* p. 623). These features exist as well with respect to registration. In addition, the failure to register is a basis for revoking the parole or probation that was ordered for the underlying offense and constitutes a separate offense. §§ 168–d(2), 168–t. The Act also provides for consideration of victim impact statements in determining the duration of registration. § 168–d(3).

On the other hand, registration is substantially different from public notification. Registration can be accomplished privately and registration does not suffer from the same excesses in design that exist with respect to notification. Hence, while some aspects of the design of the registration provisions suggest they are punitive, the overall design is not.

### (3) *History*

Registration has not historically been considered punishment; rather, "[r]egistration is a common and long-standing regulatory technique with a remedial purpose." *Artway,* 81 F.3d at 1264 (*citing United States v. Harriss,* 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 (1954); *United States v. Kahriger,* 345 U.S. 22, 73 S.Ct. 510, 97 L.Ed. 754 (1953), *overruled on other grounds by Marchetti v. United States,* 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968); *New York v. Zimmerman,* 278 U.S. 63, 49 S.Ct. 61, 73 L.Ed. 184 (1928)). *But see Arizona v. Noble,* 829 P.2d at 1222 ("We agree ... that registration has traditionally been viewed as punitive."). In striking down a registration statute for lack of notice, the Supreme Court acknowledged the regulatory nature of the act at issue: "At most the ordinance is but a law enforcement technique designed for the convenience of law enforcement agencies...." *Lambert v. California,* 355 U.S. 225, 229, 78 S.Ct. 240, 243, 2 L.Ed.2d 228 (1957).

### (4) *Effects*

Most significantly, registration does not impose a substantial affirmative disability or restraint. The Act does require individuals to register with their local precinct on an annual basis for ten years and in some cases every 90 days for life. Plaintiffs make a compelling argument that this constitutes an increase in punishment, and, indeed, the registration provisions have the effect of increasing the period of parole or probation set by the sentencing judge. This "unpleasant consequence," however, does not transform registration from a regulatory measure into a punitive one. *Ursery,* —— U.S. at ——, 116 S.Ct. at 2149. The essentially ministerial action of registration does not restrain or inhibit the sex offender's activities in any significant way.

Moreover, registration by itself does not lead to the same excesses that have followed public notification. The ostracism that has accompanied public notification will not result from the mere fact of registration. In addition, registration does not substantially interfere with the objectives of the original punishment or the eventual rehabilitation of the offender. *Nitz,* slip op. at 13. By requiring a convicted sex offender to register periodically with the local police, the Act does not inhibit the offender's rehabilitation in any meaningful way and the simple act of registration will not prevent a sex offender from reintegrating into society. Indeed, registration may further rehabilitation, as sex offenders who register with police are less likely to commit another crime because their identity, address, and criminal history are readily available. *See State v. Noble,* 829 P.2d at 1223. Although this reasoning also supports the conclusion that registration is punishment, as registration also has the effect of furthering the traditional punitive goal of deterrence, the non-punitive effects nonetheless outweigh the punitive ones.

In short, I hold that the registration provisions of the Act are regulatory and not punitive in nature.

### B. *The Due Process and Statutory Claims*

Plaintiffs also assert due process and statutory claims. The statutory claim is as follows: the Act provides for the sentencing court to determine the risk classification for incarcerated offenders who are about to be released. § 168-n. In contrast, however, the risk classifications for persons already on parole or probation on the effective date of the Act are being determined by the Division of Parole or the Division of Probation rather than by a court. § 168-g(1). Plaintiffs contend that not only is there no statutory basis for this practice, it conflicts with the statute's language and design.

For their due process claim, plaintiffs contend that the rights of individuals on parole or probation on the effective date of the Act are also being violated because of the manner in which risk levels are being assigned by the

Divisions of Parole and Probation. In particular, plaintiffs contend that such individuals are receiving no notice or opportunity to be heard before the risk level classifications are imposed.

I do not need to reach these claims, however, because I am granting plaintiffs' motion for summary judgment with respect to the public notification provisions of the Act. Hence, plaintiffs' due process and statutory claims are dismissed without prejudice as moot.[20]

## CONCLUSION

For the foregoing reasons, the parties' cross-motions for summary judgment are granted in part and denied in part.

The Clerk of the Court shall enter judgment as follows: (i) in favor of plaintiffs on their claim that retroactive application of the notification provisions of the Act would violate the Ex Post Facto Clause; (ii) permanently enjoining defendants, their agents, employees, and all persons acting in concert with them from enforcing the public notification provisions of the Act, including §§ 168–*l* (6)(b) and (c), 168–p, and 168–q, against persons who committed their crimes before January 21, 1996; (iii) in favor of defendants dismissing with prejudice plaintiffs' claim that retroactive application of the registration provisions of the Act would violate the Ex Post Facto Clause; and (iv) in favor of defendants dismissing without prejudice plaintiffs' due process and statutory claims as moot.

SO ORDERED.

---

20. The determination of risk classification is important only for purposes of notification. Since I am enjoining application of the notification provisions of the Act with respect to all individuals who committed their crimes before the Act took effect on January 21, 1996, defendants cannot enforce notification with respect to individuals already on parole or probation on January 21, 1996. Hence, no purpose would be served by classifying these individuals. Moreover, even if they are classified, the individuals in question will suffer no harm as notification may not be implemented as to them in any event.