

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-20-1997

# E.B. v. Verniero (Part II)

Precedential or Non-Precedential:

Docket 96-5132,96-5416

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"E.B. v. Verniero (Part II)" (1997). *1997 Decisions.* Paper 200.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/200

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

mJ

supra, at 1228-34 (describing the decreased use of shaming punishments as colonial communities grew in size thereby increasing the likelihood that the offender was a stranger to the witnesses of his punishment); see also Dan M. Kahan, What do Alternative Sanctions Mean?, 63 U. Chi. L. Rev. 591, 631 (1996) ("Early Americans turned to imprisonment in large part because they believed that existing criminal penalties had lost the power to shame.").8 Moreover, as noted above, central to

_____

6. I rely here on the type of information released pursuant to the Attorney General's guidelines implementing notification. See N.J. Stat. Ann. § 2C:7-8(d) (1995). I assume that the guidelines accurately reflect the legislative purpose in this respect.

7. Contrary to the majority's assertions, there is no evidence of which I am aware that a colonial settlement would have known prior to the shaming itself of an offender's crime. I suspect that if the community was already aware of the crime, then shaming punishments would be unnecessarily duplicative.

8. In an interesting, perhaps ironic twist, the need for notification provisions arises because of the "anonymity afforded by modern society."

81

many of the shaming punishments was some notice-- e.g.,
a sign, a label, or a brand -- of the offense(s) for which the
offender was being punished.

In contrast, warning or wanted posters and quarantine
notices do not disseminate the same type of information
disseminated by notification provisions. A warning or
wanted poster, displayed in an effort to catch escaped
prisoners or to arrest alleged criminals, obviously does not
include information about the location of the offender's
current dwelling, nor of his current employment. If the
authorities had this information, they would know how to
apprehend the offender. Such posters also typically include
information about the facts of the individual's escape in the
case of a warning poster, and the facts of the individual's
alleged crime in the case of a wanted poster. Quarantine
notices, too, include information different from that
included in notification provisions. The most prominent
difference is that quarantine notices include health-related
information; such notices make no mention of criminal or
alleged criminal activity. Information provided pursuant to
notification, then, links the registrant to some act for which
he is blameworthy. Health related information is normally
not related to culpability.

The state attempts to distinguish the notification
provisions from the shaming punishments in terms of the
scope of the notification. New Jersey makes much of the
fact that the notification provisions, unlike the shaming
punishments, do not involve the dissemination of
information to the entire community. I believe that the state
overstates the significance of this difference. Though
notification under both Tier 2 and Tier 3 is intended to be
limited, the design of the provisions seems to encourage
more widespread dissemination. Tier 3 recipients are not
warned that the information is confidential. Tier 2

_____

Recent Legislation, 108 Harv. L. Rev. 787, 790 (1995) (discussing the
Washington state sex offender notification statute). Piercing the veil of
modern anonymity may serve remedial purposes, such as alerting the
community to the risk that a convicted sex offender who resides nearby
may re-offend, but it also may serve punitive purposes, such as
providing the community a target for harassment.'

recipients are so warned, but I fail to see how that warning is to be taken seriously. Under Tier 2, notification is given to the staff of organizations charged with the care or supervision of children and/or women. Such notification would effect the remedial purpose of the statute-- the protection of the children and women under the care of the organizations -- only if the organizations pass the notification information to the children and women under their care.

New Jersey also emphasizes that notification is tailored to the specific offender and may not occur at all. In emphasizing this aspect of notification, the state fails to appreciate fully the textured nuances of the shaming punishments. Shaming punishments were also tailored to the specific offender and often did not occur at all. For instance, permanent labeling and branding were reserved for offenders whose likelihood of re-offense was high. See Friedman, supra at 40. Only the "deep-dyed sinner" would suffer such a fate. Id. Further, shaming punishments were by no means automatic; not all offenders would be so punished. Fines or bonds for good behavior (payments made to the authorities that were forfeited should the surety commit a misdeed within a certain time period) were common punishments for lesser offenses. See Hirsch, supra at 1224. And, even for more serious offenses, an offender could often simply pay a fine and avoid a shaming punishment altogether. See Friedman, supra at 38 (describing the punishment for a woman who struck her husband as either half an hour at a town meeting with her offense written on her forehead or the payment of a fine to the county).

5. Summary: Shaming Punishments as the Best Analogy

In sum, the foregoing analysis demonstrates that the closest historical analogues to the notification provisions of Megan's Law are the shaming punishments, which were traditionally considered punitive.9 Like the shaming

_____

9. It is interesting to note that in recent years courts nationwide have returned to versions of the colonial shaming punishments. See Kahan,

punishments, notification is carried out by the state. In
that sense, notification is unlike measures in which the
state merely allows private individuals or entities to access
information and then allows those individuals to release
that information more broadly. Moreover, like the shaming
punishments, notification provides the community with
information about the registrant's identity and physical
description, place of residence, place of employment, and
criminal history. Such information is judicially endorsed.
The information provided by notification is different from
that provided by warning or wanted posters, which do not
provide information about residence and employment, and
quarantine notices, which do not provide information about
criminal history; none of this information is judicially
endorsed. Above all notification is the functional equivalent
of shaming punishments; notification publishes information
about the registrant calculated to reach the entire
community and likely to lead to public opprobrium.

D. Does the Text, Legislative History, or Design of
the Notification Provisions Demonstrate That
They are not Punitive?

1. Introduction; The Role of Law Enforcement

Under Artway, the notification provisions must be
considered punishment provided the text or legislative
history does not demonstrate that they are not punitive. I
therefore turn to the question whether the text or legislative
history so demonstrates. This part of the analysis requires
an examination of the actual operation or design of the

_____

supra, at 631–34. Courts might require individuals to wear t-shirts or
bracelets announcing their crime, to post placards on their houses or
bumper stickers on their cars, to stand in public places wearing signs,
or to apologize publicly to the community or their victims. See id. at 632–
34. The actual, stated purpose of these measures is punitive; in that
sense, they differ from Megan's Law. However, these measures suggest a
shared cultural understanding, still prevalent in our society, that
publicity concerning an individual's misdeeds can, and often is, intended
to punish that individual.

measure at issue. See Hendricks, 65 U.S.L.W. at 4568-70 (examining the design of the Kansas civil commitment statute). It is an inquiry focused on the question whether the legislature designed the statutory scheme in such a manner so as "to contradict the historical understanding of [the measure] as punishment." Austin v. United States, 509 U.S. 602, 619 (1993).

Perhaps the most striking feature of the statutory design is its placement of the tier classification determination and of the notification process squarely within the criminal justice system. The chapter that contains the registration and notification provisions is contained in the state's Code of Criminal Justice. Cf. Hendricks, 65 U.S.L.W. at 4568 (relying in part on the decision by the state of Kansas to place its Sexually Violent Predator Act within the probate code, instead of the criminal code, to conclude that the challenged measure was not a criminal proceeding). It is the Attorney General of New Jersey, a law enforcement officer, who is charged with "promulgat[ing] guidelines and procedures for the notification required" by Megan's Law. N.J. Stat. Ann. § 2C:7-8(a) (1995).

The guidelines are to be formulated with the advice of a "notification advisory council" comprised, at least in part, of professionals from various fields outside of official law enforcement, but the professionals are all involved, at least to some degree, in the criminal justice system, broadly defined, and this council provides, as its name suggests, mere recommendations. See id. § 2C:7-11. Once in place, the guidelines are to be implemented by the county prosecutors: they determine the risk that a particular offender poses for re-offending, thereby setting the tier classification, and they determine the means of providing notification. See id. § 2C:7-8(d).

As the guidelines are currently written, the county prosecutors have significant leeway both in determining the appropriate tier classification and in fashioning the proper notification plan. Application of the Registrant Risk Assessment Scale is by no means ministerial; the county prosecutors must determine whether the particular offender poses a low, moderate, or high risk to the community for each factor in the Scale. Although the Scale provides

85

guidance to the prosecutors making this determination, it does not eliminate from the process prosecutorial evaluation. The guidelines allow prosecutors to enlist the assistance of persons outside the prosecutor's office, such as social workers or psychologists. However, the guidelines leave formulation of the notification to the considered judgment of the county prosecutors. It is up to those law enforcement officials to ensure that the notification is properly tailored to reach those at risk of being victimized by the particular offender.

Finally, law enforcement officers, whether of the municipality in which the offender intends to reside or of the state police force, provide the actual notification. See id. §§ 2C:7-6, 2C:7-7.

2. Promoting the Aims of Punishment

The operation of the statute will, moreover, promote "the traditional aims of punishment -- retribution and deterrence." Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168 (1963); see Hendricks, 65 U.S.L.W. at 4568 ("As a threshold matter, commitment under the Act does not implicate either of the two primary objectives of criminal punishment -- retribution or deterrence."). Of course, simply because a measure has the effect of promoting retribution and deterrence does not necessarily mean that its purpose was to do so. See Artway, 81 F.3d at 1255. Still, such an effect suggests that the particular measure was not designed in a way that contradicts the historical understanding of its analogues as punitive. That the notification provisions of Megan's Law promote retribution and deterrence is demonstrated as follows.

By publicizing an offender's crime to the community, notification realizes justice, see id. (explaining that retribution "does not seek to affect future conduct or solve any problem except realizing `justice' "), in that it inflicts suffering on the offender. It is undisputed that notification results in shaming the offender, thereby effecting some amount of retribution. This suffering "serves as a threat of negative repercussions [thereby] discourag[ing] people from engaging in certain behavior." Id. It is, therefore, also a

86

deterrent. There is no disputing this deterrent signal; the notification provisions are triggered by behavior that is already a crime, suggesting that those who consider engaging in such behavior should beware. See Doe v. Pataki, 940 F. Supp. 603, 623 (S.D.N.Y. 1996) ("The Act is designed in such a fashion as to suggest that it is punitive. It contains classic indicia of a punitive scheme. Its provisions are triggered by behavior that is `already a crime.' ").

3. Excessiveness

The design inquiry is also furthered by an analysis of whether the notification provisions are excessive in relation to their stated remedial purpose. In a several important respects, they are. First, the criminal acts that, pursuant to Megan's Law, trigger registration and potentially subject an offender to notification, are over-broad. For example, kidnapping, even without a concomitant sexual offense, triggers notification, see N.J. Stat. Ann. § 2C:13-1(c)(2)(c); so, too, does consensual sexual contact that is criminalized merely because of the age of one of the participants, see, e.g., id. § 2C:14-2(a)(1), (b), (c)(5). See Doe v. Pataki, 940 F. Supp. at 623-24 (describing New York's Megan's Law as excessive because it covers individuals such as a "21-year old who engages in sexual intercourse with a 16-year old (who is not a spouse)," a person who engages in incest, and a person who restrains another under the age of 17); Kansas v. Myers, 923 P.2d 1024, 1042-43 (Kan. 1996) (describing Kansas's Megan's Law as excessive because "[s]everal of the listed felonies [triggering registration and notification] include what otherwise might be viewed as voluntary sexual contact between two persons that is considered criminal because of the minority status of the victim and the fact that the victim is not married to the accused").

Next, notification under Tier 3 is often provided to those who simply do not need to know that there is a released sex offender nearby. Tier 3 notification is to be provided to "members of the public likely to encounter the person registered." N.J. Stat. Ann. § 2C:7-8(c)(3) (1995). But the "likely to encounter" standard does not limit notification to

87

vulnerable populations. It is a standard based largely on geographic proximity, see Doe v. Poritz, 662 A.2d 367, 385 (N.J. 1995), rather than whether the recipient of notification needs protection (e.g., a child) or can protect others (e.g., a parent). Under the statute, a move by a registrant into a retirement community will trigger notification of his neighbors.[10]

Similarly, the type of information required to be provided by the guidelines is excessive; it is information individual recipients often simply do not need to know. Individuals who receive notification learn of an offender's place of residence and his place of employment, regardless of their relative locations. If an offender does not work at a location near to his place of residence, which I suspect is not uncommon, then such information is only in part useful for protection. A recipient of notification who lives, attends school, works, or is otherwise located near to an offender's place of residence should be little concerned about the location of the offender's place of employment (and vice versa). Knowing the offender's place of residence might lessen the risk that the recipient will become a victim of the released offender; he or she can avoid the offender's house, for example. But, knowing the offender's distant place of employment offers no protective assistance to the recipient. If the person is not likely to encounter the offender at the offender's place of employment (or place of residence), why would he or she need or want to know such information?

---

10. The guidelines written to implement Megan's Law may be interpreted to warn against this very problem. They suggest that the law enforcement officials responsible for implementing the notification tailor such notification so that it reaches only those at risk. However, the examples provided by the guidelines suggest limitations on the type of recipient organizations, not on recipient individuals. Moreover, the guidelines stress that, notwithstanding this suggested tailoring, geographic proximity remains the critical factor in determining the scope of notification. Additionally, once the information is released, there is no practical means of limiting its further distribution. See Kansas v. Myers, 923 P.2d 1024, 1041 (Kan. 1996) ("The print or broadcast media could make it a practice of publishing the list [of released sex offenders] as often as they chose. Anyone could distribute leaflets containing the registered information anywhere and anytime.").

88

4. Summary of "Design"

In sum, the design of the notification provisions does not contradict the historical understanding of analogues to such provisions as punitive. Notification is placed in New Jersey's criminal code and is structured and carried out by state law enforcement officials. Further, notification promotes the aims of retribution and deterrence. Finally, in important respects, notification is excessive. The particular recipients who receive notification and the type of information they receive are not carefully tailored to the remedial goals notification is intended to serve.

E. Notification Fails the History Subpart of Artway

As the foregoing discussion makes clear, the proper historical analogues to the notification provisions of Megan's Law are the shaming punishments of colonial America. Clearly punitive, such punishments evidence an objective punitive purpose for the notification provisions. Because the design of the notification provisions-- especially the placement of the provisions in the state criminal code and the placement of the responsibility of enforcing them with law enforcement officials, the excessiveness of their operation, and their promotion of retribution and deterrence -- does not negate this objective punitive purpose. Therefore, I believe Megan's Law fails the history subpart of the second prong of the Artway test and should be considered punishment. As a result, the judgment of the district court should be reversed. This conclusion is buttressed by my discussion infra at Part II.C. of the extent to which, by reason of the network of Megan's Laws throughout the nation, notification is akin to banishment, another traditional colonial measure in the nature of punishment. See supra, at Part I.C.2.11

_____

11. Because of my conclusion as to the history subpart of the Artway test, I need not examine in detail the other subparts of the objective purpose prong of the test. I mention them here only briefly. First, though it is a very close question, I doubt that the notification provisions of Megan's Law, as I have described their design, can be explained solely by a remedial purpose. Second, because, as I have discussed, the traditional understanding of historical analogues to the notification

89

II. EFFECTS

A. Introduction

The final prong of the Artway test concerns the actual
effects of the challenged measure. According to Artway, "[i]f
the negative repercussions -- regardless of how they are
justified -- are great enough, the measure must be
considered punishment." Artway, 81 F.3d at 1263.12 The
analysis required under this part of the test is one of
degree, and is guided by the signposts of already decided
cases. See id.

The conclusions I have already reached -- that Megan's
Law fails the objective purpose prong of the Artway test
and must, therefore, be considered punitive -- might make
it unnecessary for me to reach the "effects" issue. However,
because of the relevance of the effects to application of the
clearest proof standard on which the majority relies, see
infra Part III, because I believe that the majority's effects
analysis is seriously flawed, and also because the
enormous importance of the case counsels that I explain
why, I discuss the effects of the notification provisions. As
I will demonstrate, the majority, in undertaking its own
analysis, narrows the test fashioned in Artway . It does so
without support, and, given the tenor of the analysis,

_____

provisions and the design of Megan's Law evidence an objective
retributive purpose, the third subpart of the objective purpose prong is
not implicated. In other words, the third subpart of the objective purpose
prong applies only "if the legislature did not intend a law to be
retributive but did intend it to serve some mixture of deterrent and
salutary [remedial] purposes." Artway , 81 F.3d at 1263. Here, such a
retributive purpose existed.

12. Holding that the retroactive cancellation of early release credits
earned by prison inmates violated the Ex Post Facto Clause, the
Supreme Court examined the actual effect of the legislation at issue
without concern for the stated legislative purpose. See Lynce v. Mathis,
___ U.S. ___, 117 S. Ct. 891, 896-98 (1997). In so doing, the Court
reaffirmed its approach in California Department of Corrections v.
Morales, ___ U.S. ___, 115 S. Ct. 1597 (1995), on which Artway based
the effects prong of its test. See Lynce, 117 S. Ct. at 897.

90

unnecessarily. I also identify problems with its substantive discussion.

B. Methodology: The Proper Standard for
Evaluating Effects

To begin, I quote from the majority's opinion: "It necessarily follows that some limit must be placed on the situations in which a measure's sting alone, despite its remedial purpose and effect, will constitute punishment under those clauses and that classification as punishment on the basis of sting alone must be reserved for cases involving deprivation of the interests most highly valued in our constitutional republic. . . . Interests such as these are sufficiently fundamental to our constitutionally secured liberty that state interference with them can be justified only by the most important of state interests." With the second sentence, the majority states that the line marking the boundary between a non-punitive and a punitive measure varies according to the remedial interest sought to be served by the measure. In other words, it appears that the majority is holding that the more important the remedial interest served by a particular measure the more harsh the sting of the measure's effects may be before the measure is classified as punitive. Nothing in Artway (or, for that matter, in the Supreme Court jurisprudence on which it draws) suggests such a formulation of the effects prong. To the contrary, Artway posits that a particular sting either falls on the punishment side of the line or it does not. At issue here is the particular sting, not the particular remedial interest.

The majority has thus introduced a difficult-to-apply sliding scale into an already complex test. This needless complication would render it nearly impossible to determine whether a particular sting is punishment. For example, as we know from Hawker v. New York, 170 U.S. 189 (1898), the revocation of a license to practice one's profession is not considered punishment. However, could such a revocation be punishment if the remedial interest served by the challenged measure is relatively unimportant? If so, at what point does the importance of the remedial interests render such a revocation non-punitive? Under the majority's

91

reading of Artway, an analysis of the effects prong requires a two-track inquiry, guided only by a few fixed points. I fear that this amorphous inquiry might lead to an elusive or protean jurisprudence, something to be avoided.

Moreover, because the other prongs of the Artway test adequately stir into the mix the remedial interests served by the particular measure, we need not examine those interests under the effects prong. The actual purpose prong examines whether the legislature subjectively intended the measure to advance remedial interests. All three subparts of the objective purpose prong require the reviewing court, to some degree, to consider the remedial interests the legislature subjectively believed it was advancing by enacting the challenged measure. Considering the stated remedial purpose under the effects prong might over-emphasize that stated purpose, thereby potentially allowing diversion of attention from the actual operation of the measure.

The majority also narrows the Artway test by requiring that, at a minimum, a challenged measure act to deprive affected persons of a sufficiently fundamental interest before that measure is considered to cause punitive effects. The majority offers no support for this proposition in either logic or precedent, and I am unaware of any. Nothing in Artway (or, for that matter, in the Supreme Court jurisprudence on which it draws) suggests such a formulation of the effects prong. In addition, at least as I read the majority's opinion, defining the effects prong in this manner is unnecessary to the result. The majority apparently believes that the effects caused by notification simply are not harsh enough to classify Megan's Law as punitive. Under my reading of Artway, satisfaction of the effects prong does not require overcoming such a difficult hurdle.

I am especially concerned in this regard because of the indefiniteness of the majority's formulation. It is not apparent to me what would constitute a "sufficiently fundamental interest." Furthermore, without a clear understanding of those interests the deprivation of which might constitute punishment, I am also unsure as to whether the majority adequately defines the universe of interests that it, or I, would deem worthy of protection. In

92

short, I fear that the majority might have left too little room to deal with unforeseen cases in this difficult area of jurisprudence.

In addition to re-formulating the Artway test, the majority also treats the effects of notification in such a manner as to minimize the impact of those effects. First, it emphasizes that the effects of which the offenders complain -- e.g., isolation, public humiliation, loss of employment opportunities, and physical violence -- are indirect. Although I agree that such is the case, I remonstrate against what seems to be overemphasis upon that aspect of notification for, in itself, indirectness of effects is not dispositive.

The Supreme Court addressed the question of directness in California Department of Corrections v. Morales, ___ U.S. ___, 115 S. Ct. 1597 (1995), the very case on which Artway bases the effects prong of its test. The Court struggled with the question whether a change in the procedures governing parole suitability hearings would effect an impact on a prisoner's expected term of confinement. See id. at 1602-05. In concluding that the measure did not constitute punishment, the Court determined that the changes in the relevant procedures "create[d] only the most speculative and attenuated possibility of producing the prohibited effect of increasing the measure of punishment for covered crimes." Id. at 1603. The Court made plain, however, that even the indirect effects of a measure could render it punitive.

Here, the indirect effects of notification are neither "speculative" nor "attenuated." In fact, notification advances the stated remedial purposes of Megan's Law only insofar as it induces many of these indirect effects. For example, public safety is enhanced if potential victims of an offender are warned to avoid him, thereby isolating him from the larger community. If the legislature were not aware that at least partial isolation would necessarily result from notification, I doubt that it would have believed that notification would serve the remedial purposes it sought to advance. And, although not necessarily vital in ensuring the efficacy of Megan's Law, other indirect effects -- e.g., harassment, loss of employment opportunities, and

93

physical violence -- surely were anticipated as also being inevitable. New Jersey was not the first state to adopt notification provisions, and the experiences of other states must have informed the New Jersey legislature as it considered Megan's Law.

In other states, notification has caused harassment, loss of job opportunities, and the like. A study by the Washington State Institute for Public Policy, released in December 1993 (approximately ten months prior to the enactment of Megan's Law), reported numerous instances of harassment following notification in Washington, some quite severe, under its 1990 Community Protection Act. See Sheila Donnelly & Roxanne Lieb, Community Notification: A Survey of Law Enforcement 7 (1993). In short, most of the indirect effects of notification are expected and foreseeable.

The second manner in which the majority minimizes the impact of the effects of notification is by separating the analysis into two distinct parts. It first examines the effect of notification on the reputational interests of the offender; then it examines the effect of notification on the increased risk of physical violence. The majority concludes that each of these effects, by itself, does not produce a sting harsh enough to classify notification as punishment. It fails, however, to determine whether these effects, if examined together, are sufficiently harsh. The difference between these two approaches is manifest. Individual effects each might produce only a moderate sting; adding together these little stings might, however, produce a great big sting. In the real world, it is the total sting that the recipient feels. It is not clear why the majority chose not to add these stings together. And, at least from my reading of Artway, there is no justification for choosing not to do so. Rather, I believe that Artway (and Morales) require an analysis of all the effects of a measure, provided they are not too speculative or attenuated, and here they are not.

C. Actual Effects

Turning from methodology to substance, I first note my agreement with the majority's identification of the effects caused by notification as including isolation, harassment,

94

loss of employment and housing opportunities, damage to property, and physical violence.13

As is clear from the majority's description of the effects of notification, the burden imposed by the collective weight of all of these effects is borne by the offender in all aspects of his life. At worst, the offender is literally cut off from any interaction with the wider community. He is unable to find work or a home, cannot socialize, and is subject to violence or at least the constant threat of violence. At best, he must labor within significant confinements. Although perhaps some people will hire him or rent him a home, his social intercourse with others is all but non-existent. The effects of notification permeate his entire existence. See Doe v. Gregoire, 960 F. Supp. 1478, 1486 (W.D. Wash. 1997) ("[H]ere the punitive effects are dominant and inescapable."); Roe v. Office of Adult Probation, 938 F. Supp. 1080, 1092 (D. Conn. 1996) ("Notification is an affirmative placement by the State of a form of public stigma on Roe, and this stigma by its very nature pervades into every aspect of an offender's life."). And, although the majority's opinion is eminently fair, I think that it understates the effects of notification provisions. Throughout the nation, there are continual reports of harassment, threats, isolation, and violence. In the margin, I mention some of the most recent occurrences.14

_____

13. I recognize that analysis of the notification provisions presents potentially difficult causation questions. For example, given that criminal history information is publicly available, it is not clear whether the harassment to which a released offender might be subject is caused by government notification or by the general availability of such information. It could well be that (and the record indicates instances in which) a community becomes aware of the presence of a released offender through the media. That said, the very fact that the state believes it important to notify persons about the location of a sex offender could both drive these media reports and spur local communities into action. In such event, notification could be characterized as a cause of these effects.

14. In California, where the information about released sex offenders can be accessed on CD-ROM, a released offender's car wasfirebombed. See Carolyne Zinko, Flyers Falsely Call Artist a Molester, S.F. Chron., July 14, 1997, at A1. Reaction to notification is often swift; another report

95

Although the question is very close, I believe that there is a strong argument that the harshness of the effects of notification are closer to imprisonment and revocation of citizenship than to a loss of a profession or of benefits. Like imprisonment and the revocation of citizenship, notification is all-pervasive. In that sense, the offender has almost no refuge from the sometimes severe effects of notification. He may seek to move to another state, but the majority of states has some form of community notification. He could, perhaps, move out of the country to avoid this network of domestic Megan's Laws. At the extreme, then, notification has become, at least for that offender, akin to banishment. See Doe v. Pataki, 940 F. Supp. at 626 ("Notification statutes have resulted in the banishment of sex offenders both literally and psychologically."). This pervasive aspect of notification differentiates it from the loss of employment opportunities and the loss of benefits.15

_____

from California notes that a neighborhood organized a protest within one day of receiving notification in order to drive the released offender from the community. See Bonnie Hayes & Frank Messina, Few Turn Out for Megan's Law Viewing in O.C., L.A. Times, July 2, 1997, at A1. Further, the community reaction does not easily wane. In New York, two neighbors of a sex offender protested in front of his house for months in an effort to force him to leave. See Today (NBC television broadcast, June 24, 1997). Even those who have endeavored to help reintegrate released sex offenders into the community have been thwarted; in some areas, local churches have been unable to assist offenders because individual congregants have made it impossible for the offenders to stay in the flock. See Lisa Richardson, Megan's Law is Put to Test as Towns Bounce Child Molesters, L.A. Times, May 25, 1997, at A3. In fact, so potent a weapon is notification, that there are reports of false notifications, presumably initiated by private individuals intent on carrying out a personal vendetta. See Zinko, supra, at A1.

15. In both De Veau v. Braisted, 363 U.S. 144 (1960) (plurality opinion), and Hawker v. New York, 170 U.S. 189 (1898), the Supreme Court held that the loss of certain employment opportunities did not constitute punishment. However, the loss of such opportunities was limited; in De Veau, the relevant statute forbade a felon from work as a union official, see De Veau, 363 U.S. at 145, and in Hawker , the relevant statute forbade a felon from practicing medicine, see Hawker, 170 U.S. at 190. In neither case did the statute limit all employment opportunities.

96

Perhaps the most difficult question in this context is whether notification is fairly considered punishment when civil commitment -- a form of involuntary confinement -- is not. In <u>Hendricks</u> the Supreme Court held that a state statute allowing the confinement of convicted sex offenders after the expiration of their prison term did not constitute punishment. Important to the Court was the traditional understanding of civil commitment as non-punitive. But beyond that distinction, I note two respects in which notification under Megan's Law may be considered more harsh than the civil commitment statute at issue in <u>Hendricks</u>.

First, anyone confined under the Kansas statute was afforded some form of treatment if such was possible. <u>See</u> <u>Hendricks</u>, 65 U.S.L.W. at 4569-70. No such treatment is available to those subject to notification under Megan's Law, and there is at least some evidence in the record that the isolation engendered by notification may in fact cause some offenders to recidivate. <u>See</u> Prentky Aff. ¶ 4, Appellants' App. at 189; <u>see also Doe v. Pataki</u> , 940 F. Supp. at 628. Thus, the effects of civil confinement might be rehabilitative, while those of notification are exactly the contrary. Second, the Kansas statute required a yearly reevaluation of the confined offender. <u>See Hendricks</u>, 65

_____

In <u>Flemming v. Nestor</u>, 363 U.S. 603 (1960), the Supreme Court held that the loss of social security benefits did not constitute punishment. In the context of the particular statute, however, the sting of that loss is not as sharp as might be supposed initially. First, the spouse of the beneficiary might still be eligible for benefits. <u>See id.</u> at 606 n.2. Second, the loss is triggered by deportation from the United States. <u>See id.</u> at 604-05 & n.1. There is no indication whether the deportee might be eligible for similar benefits in the country to which he is deported. Thus, the loss of social security benefits in this context does not necessarily render the affected individual destitute or without assistance; he has other places to turn.

In a similar vein, we have recently held that the eviction of a tenant from public housing because of a drug offense is not punitive, <u>see Taylor v. Cisneros</u>, 102 F.3d 1334, 1341-1344 (3d Cir. 1996), but such an eviction did not prevent the affected individual from obtaining housing elsewhere.

U.S.L.W. at 4569. The registration and notification provisions in Megan's Law are applicable for at least fifteen years. See N.J. Stat. Ann. § 2C:7-2(f) (1995). It is possible, then, that the sting of notification will last far longer than that of civil commitment.

D. Summary

In sum, although I do not rely on my analysis of the effects prong of the Artway test to support my ultimate conclusion, I note that the majority's discussion of effects is seriously flawed in terms of both procedure and substance, casting further doubt upon the judgment and shoring up still further my dissenting posture. The majority improperly and unnecessarily narrows the effects prong of Artway by requiring that a measure deprive an individual of a constitutionally secured fundamental right and by examining the effects in isolated groupings. Finally, its substantive discussion of actual effects is, in important respects, flawed.

III. THE "CLEAREST PROOF" DOCTRINE

The majority's most serious challenge to my position inheres in its argument, citing Hendricks and referring to Ursery, that only the "clearest proof" will negate congressional intent to deem a measure non-punitive. In terms of the Artway test, then, the majority effectively holds that should a measure be considered non-punitive under the test's first (actual purpose) prong, then there is a strong presumption that the measure is non-punitive, and only the clearest proof as to the second (objective purpose) and third (effects) prongs of the test will overcome that presumption. I am unpersuaded. First, the etiology of the "clearest proof" doctrine is such that I doubt that the Supreme Court would apply it in this context with such clear and direct historical antecedents, so plainly punitive in character, to the community notification provisions of Megan's Law. Second, even if the standard were applied here, I believe that the historical context of notification, the design of Megan's Law, and the effects resulting therefrom, provide sufficiently clear proof of objective intent to negate remedial purpose.

98

The clearest proof standard was first articulated in Flemming v. Nestor, 363 U.S. 603 (1960). In Flemming, the Supreme Court addressed a contention that the legislative history and design of a statute that allowed the Secretary of Health, Education, and Welfare to terminate Social Security benefits payable to aliens deported due to their political affiliations evidenced a punitive congressional intent that negated a stated remedial intent. The Court stated:

We observe initially that only the clearest proof could suffice to establish the unconstitutionality of a statute on such a ground. Judicial inquiries into Congressional motives are at best a hazardous matter, and when that inquiry seeks to go behind objective manifestations it becomes a dubious affair indeed. Moreover, the presumption of constitutionality with which this enactment, like any other, comes to us forbids us lightly to choose that reading of the statute's setting which will invalidate it over that which will save it.

Id. at 617.

The Court has since employed the clearest proof standard in at least six cases. In Communist Party of the United States v. Subversive Activities Control Board, 367 U.S. 1 (1961), the Court considered whether, despite manifest congressional intent to the contrary, a measure was actually intended to outlaw the Communist Party. The Court stated that only the clearest proof would negate that congressional intent. In United States v. Ward, 448 U.S. 242 (1980), the Court required the clearest proof that, despite the manifest intent to create a civil proceeding, a fine under the Federal Water Pollution Control Act was nevertheless a criminal proceeding. In United States v. One Assortment of 89 Firearms, 465 U.S. 354 (1984), and in Ursery, the Court applied the clearest proof standard to determine whether civil forfeiture statutes were punitive. Examining the Illinois Sexually Dangerous Persons Act, the Court in Allen v. Illinois, 478 U.S. 364 (1986), stated that only the clearest proof would negate the legislative intent that proceedings determining whether an individual should be committed to psychiatric care were civil in nature. Finally, and most recently, in Hendricks, the Court used

the clearest proof standard in the context of a challenge to a civil commitment statute.

Although the Supreme Court has repeatedly applied the clearest proof standard in the context of challenges alleging that subjective legislative intent is different from objective legislative intent, I am unwilling to apply the clearest proof standard in this context, at least until the Supreme Court makes it clear that doing so is appropriate. The clearest proof standard creates a nearly irrebuttable presumption that favors subjective legislative intent over objective manifestations of that intent. In an excess of caution, I eschew exploration of the extent to which such a presumption can create incentives for legislatures to obscure their actual intent with subjective intent, rendering it unwise to employ it in certain circumstance. The purpose of the "clearest proof" exercise is to provide a technique to determine legislative intent. This technique is unnecessary here, where, as I have explained, notification measures are so plainly the direct descendants of historical punitive schemes. It seems to me, moreover, that something more than subjective intent alone must be shown to abrogate the historical understanding that notification measures are punitive. In other words, a legislature's simply denying that it is operating outside of a shared cultural tradition does not make it so.

This argument may be illuminated by flipping the coin over, as it were, and looking at the issue by assuming that the clearest proof standard applies in this case. In such event, I believe that such proof exists. At the threshold, I warn against placing too much emphasis on the meaning of "clearest proof." As _Flemming_ and its progeny make patent, the standard is intended as a kind of warning to the federal courts to give legislatures the benefit of the doubt. It is thus consistent with familiar canons of statutory interpretation and constitutional adjudication stating that legislatures are rational bodies that intend to function within their powers to enact lawful measures. In cases in which there is little doubt, however, there is no benefit to give.

Here, there is little doubt. As Part I.C. makes clear, notification measures have historically been considered punitive. As Part I.D. makes clear, the particular design of

notification under Megan's Law in no way contradicts this history. And, as Part II makes clear, the effects of notification measures suggest strongly their punitive nature; the majority's efforts to dilute the Artway effects prong, see supra Part II, are unavailing. Taking the foregoing factors together, then, I conclude that sufficient proof of an objective punitive intent motivating the notification provisions of Megan's Law exists to negate the subjective remedial intent.

IV. CONCLUSION

We should and do endeavor mightily to protect our children from the dangers of the modern world. There is, however, a background risk of violence from which we simply cannot shield them. I believe that the New Jersey legislature desperately wanted to do all that it could to prevent the murder of any child at the hands of a released sex offender. But, if a released sex offender is intent on repeating his offense, there is no reason to believe he will necessarily limit himself to his surrounding community (or, for that matter, limit himself to his state).

Unfortunate though it may be, dangers to our children can come from anywhere. People in the community, especially parents, therefore justifiably warn children more sternly about interacting with strangers, wandering too far from home, staying out past dark, etc. There is no way to determine how many crimes will be prevented by all of the Megan's Laws throughout the country. I suspect, however, that the change in protection secured by notification will be marginal at best. Query whether this marginal change is worth tampering with "an essential thread in the mantle of protection that the law affords the individual citizen." Lynce v. Mathis, ___ U.S. ___, 117 S. Ct. 891, 895 (1997) (discussing that group of constitutional provisions protecting against the retroactive application of new laws).

It is instructive to note that this issue bears a similarity to the challenge the Supreme Court recently faced in Reno v. ACLU, 65 U.S.L.W. 4715 (U.S. June 24, 1997) (No. 96-511). There, underlying the Court's decision to strike down key provisions of a statute purporting to rid the Internet of

obscenity is the notion that vital constitutional protections must not be swept away in the understandable fervor to protect our children. Basic constitutional rights fundamental to ordered liberty, like the freedom of speech and the right to be free from the retroactive application of the laws, impose on each of us certain burdens. We will remain a free people only so long as we accept those burdens, even in the face of the very safety of our children. Recognizing the rights of released sex offenders, unpalatable though that may be, is one of them.

Although I am outvoted on the double jeopardy/ex post facto issue, I am at least comforted by our holding that the notification machinery, with all of its attendant consequences, will not be triggered without the significant safeguard of requiring the state to establish the case for notification by clear and convincing evidence.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

102